UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------------------- x

In Re: New York City Policing During Summer
2020 Demonstrations

20 Civ. 8924 (CM)(GWG)

--------------------------------------------------

This filing is related to:

ADAM GRAY, JASON DONNELLY, DIANA
ZEYNEB ALHINDAWI, JEMELL D. COLE,
and AMR ALFIKY,

21 Civ. 6610 (CM)(GWG)

Plaintiffs,

**THIRD AMENDED COMPLAINT**

- against -

CITY OF NEW YORK, OFFICER NICHOLAS
TERRETT, OFFICER LUIGI TIRRO, OFFICER
ADAM MUNIZ, OFFICER LEONEL GIRON,
DEPUTY INSPECTOR STEPHEN SPATARO ,
LIEUTENANT  ROBERT CATTANI,
LIEUTENANT DANIEL GALLAGHER,
CAPTAIN GZIM PALAJ, OFFICER BRIANNA
CARLO, SERGEANT  CHRISTOPHER B.
HEWITSON, OFFICER  CHRISTOPHER
RADZINSKI, OFFICER SEAN P. ROBINSON,
SERGEANT DANIEL SLEVIN, AND
LIEUTENANT KEITH HOCKADAY

Defendants.

------------------------------------------------------- x

     1.     Plaintiffs Adam Gray, Jason "Jae" Donnelly, Diana Zeyneb Alhindawi, Jemell

"Mel" D. Cole, and Amr Alfiky (collectively, the "Plaintiffs"), by and through their undersigned

attorneys, for their Third Amended Complaint ("Complaint") against Defendant the City of New

York (the "City"), and against Defendants New York City Police Department ("NYPD") Officer

Nicholas Terrett, NYPD Officer Luigi Tirro, NYPD Officer Adam Muniz, NYPD Officer Leonel

Giron, NYPD Deputy Inspector Stephen Spataro, NYPD Lieutenant Robert Cattani, NYPD

Lieutenant Daniel Gallagher, NYPD Captain Gzim Palaj, NYPD Officer Briana Carlo, NYPD

Sergeant Christopher B. Hewitson, NYPD Officer Christopher Radzinski, NYPD Officer Sean P.

Robinson, NYPD Sergeant Daniel Slevin, and NYPD Lieutenant Keith Hockaday (collectively,

the "NYPD Officer Defendants"), hereby allege as follows:

     **I.**     **NATURE OF THE ACTION**

     2.     This is a civil rights action challenging the NYPD's policy, custom and practice

of obstructing and retaliating against visual journalists and other members of the press for

exercising their First Amendment rights to gather news regarding police activity in public places.

     3.     The First Amendment right to film police officers engaged in their official duties

in public places is not only essential to news gathering, it also critically serves the public's right

to receive images and information about how its government is functioning.  As the U.S. Court

of Appeals for the First Circuit put it: "Gathering information about government officials in a

form that can readily be disseminated to others serves a cardinal First Amendment interest in

protecting and promoting 'the free discussion of governmental affairs.'"[1]  The U.S. Department

of Justice has also recognized that this First Amendment right to record police officers in public

is "consistent with our fundamental notions of liberty, promote[s] the accountability of our

governmental officers, and instill[s] public confidence in the police officers who serve us daily."[2]

Recently, the New York State legislature enshrined into law the fundamental importance of the

public's right to record law enforcement activity, with the enactment of the New Yorker's Right

to Monitor Act, N.Y. Civil Rights Law § 79-P.

     4.     Notwithstanding this clearly established First Amendment right, NYPD police

officers assaulted and/or arrested each of the Plaintiffs – all professional photojournalists –

---

[1] *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)).

[2] Statement of Interest of the United States at 1, *Sharp v. Baltimore City Police Dep't*, No. 11 Civ. 2888 (D. Md. Jan. 10, 2012), ECF No. 24.

without probable cause in separate instances, which together demonstrate a chilling pattern.  In each case, each Plaintiff was in the process of lawfully, peacefully gathering news by photographing police activity from a public street or sidewalk, when he or she was targeted by one or more of the NYPD Officer Defendants.  Four of the Plaintiffs were rushed at and struck or shoved to the ground.  Three were arrested without probable cause, even as they clearly announced to the arresting officers that they were members of the press and/or presented press credentials.  None were prosecuted, because there was no legal basis to do so.

5.      The unlawful assaults and arrests of the Plaintiffs were not isolated events.  The NYPD has demonstrated a longstanding custom, pattern and practice of unlawfully interfering with the recording of police activity conducted in public view – a pattern revealed with clarity during the protests in New York City following the death of George Floyd in the summer of 2020 (the "George Floyd Protests").  This custom, pattern and practice is the result of a lack of adequate training regarding the First Amendment right of the press and public to record police activities in public, a failure to supervise and discipline officers who retaliate against or interfere with this right, and deliberate indifference by NYPD supervising personnel to a culture of disregard for the constitutional right to record police activity in public.

6.      By assaulting and arresting the Plaintiffs for the sole reason that they were recording police activity in public, the NYPD Officer Defendants violated each Plaintiff's clearly established rights under the First Amendment to the United States Constitution and under Article 1, Section 8 (the "Free Press Clause") of the New York State Constitution.  The NYPD Officer Defendants also violated the clearly established rights of three of the Plaintiffs under the Fourth Amendment to the United States Constitution to be free from arrest and seizure of their property without probable cause.  In committing these constitutional violations, the NYPD Officer

3

Defendants were acting pursuant to the City's longstanding policy, custom and practice of restricting or retaliating against the press as they attempt to gather news on police activity, as well as failing to observe the rights of the press and public to record police conduct in public.

7.     With this civil rights suit, Plaintiffs seek declaratory relief for the violation of their constitutional rights, compensatory and punitive damages for Defendants' unlawful actions, and injunctive relief directing the City to implement an effective policy to train its officers on the First Amendment right of the press and public to record police activity in public locations, and to appropriately discipline those officers who violate this constitutional right.

## II.    PARTIES

8.     Plaintiff Adam Gray is a professional visual journalist based in New York City. Mr. Gray is Chief Photographer for the British press agency South West News Service ("SWNS").  In this role, Mr. Gray regularly engages in news photography and video assignments across North America and internationally.  Mr. Gray has covered conflict zones and civil unrest, including the failed coup in Turkey in 2016, the Syrian migrant crisis in Europe, the COVID-19 crisis, and the war in Ukraine.  His work has been published in numerous media outlets including *The U.S. Sun*, *Paris Match*, *The Times* of London, *The Daily Telegraph*, *The Guardian*, and *The Daily Mail*.  Mr. Gray previously worked as a Director of Photography for Barcroft Studios, traveling the United States and producing, directing and filming documentaries for digital media and broadcast outlets.  Mr. Gray's documentaries have garnered tens of millions of views online. In 2020, Mr. Gray was awarded three prizes by the British Press Photographers' Association, including BPPA Photographer of the Year.  In 2021 he was named the New York Press Photographers Association's Photographer of the Year.  Mr. Gray's work in news photography and videography has also received high commendations from the UK Picture Editors' Guild.

Mr. Gray is a citizen of the United Kingdom, and works legally in the United States pursuant to an I-Visa.  He holds press credentials issued by the National Police Chiefs Counsel in the United Kingdom and the Foreign Press Centers of the U.S. Department of State.  As of June 16, 2020, Mr. Gray also holds press credentials issued by the NYPD's Office of the Deputy Commissioner, Public Information ("DCPI").  Mr. Gray resides in New York City.

9.      Plaintiff Jason ("Jae") Donnelly is a professional freelance visual journalist based in New York City.  Mr. Donnelly works largely on assignment for *The Daily Mail*, and his photographs have also been published in *The Guardian*, *The Independent*, *The Times*, *The Sun*, *The Mirror*, *The New York Post*, *Vanity Fair*, and broadcast on the BBC, ITV, Channel 4, CNN, Fox, and NBC.  Mr. Donnelly has photographed in a variety of environments and circumstances, from drug raids in Peru to the 2014 protests in Ferguson, Missouri.  .  Mr Donnelly has been recognized as a trusted photographer by the U.S. Secret Service in connection with his coverage of Presidential families, and has been trained in photographing in hostile environments.  Mr. Donnelly also spent years covering Jeffrey Epstein, and his photograph of Mr. Epstein walking with Prince Andrew, Duke of York in Central Park sparked a widespread inquiry into Prince Andrew's relationship with the convicted sex offender.  Mr. Donnelly is a citizen of the United Kingdom, and works legally in the United States pursuant to an I-Visa.  He holds valid press credentials issued by the Foreign Press Centers of the U.S. Department of State.  Mr. Donnelly resides in New York City.

10.      Plaintiff Diana Zeyneb Alhindawi is a professional documentary and news photographer.  Based in New York City, Ms. Alhindawi works internationally in areas experiencing conflict, social unrest or humanitarian emergencies.  Her photographs have been published in various media outlets, including *The New York Times*, *The New York Times*

*Magazine*, *The Sunday Times*, *The Wall Street Journal*, Al Jazeera America, *Le Monde*, CNN, *National Geographic Traveler*, *Vice*, *Geo Germany*, *Newsweek, Toronto Star*, and *Paris Match*, as well as by international NGOs like Doctors Without Borders/Médecins Sans Frontières, Save the Children, Human Rights Watch and the International Committee of the Red Cross ("ICRC"), and UNICEF.  In 2014, Ms. Alhindawi was named one of Lens Culture's Top 50 Emerging Talents for 2014.  In 2015, she received the ICRC Humanitarian Visa d'Or Award for her coverage of the Minova Rape Trial, eastern Congo's most significant mass rape trial to date.  In 2018, she was named one of Photo District News' 30 New and Emerging Photographers to Watch.  Ms. Alhindawi holds bachelor's degrees in economics and in neuroscience from Johns Hopkins University, and is working on a master's degree in International Development from American University, School of International Service.  At the time of the events in suit, Ms. Alhindawi held a press pass issued by the Frontline Freelance Register, an international representative body for freelance journalists.  Ms. Alhindawi resides in New York City.

11.     Plaintiff Jemell ("Mel") D. Cole is a professional visual journalist and music photographer who resides in Jersey City, New Jersey.  Mr. Cole had until 2020 been best known for his photographs of musicians, which have been published and featured by *Rolling Stone*, *iD Magazine*, CNN, *URB Magazine*, and *Complex Magazine*.  A compilation of his photography, *Great: Photographs of Hip Hop by Mel D. Cole, 2002-2019*, was published in 2020.  In May 2020, Mr. Cole began documenting protests and demonstrations, beginning with the George Floyd Protests, and continuing through the November 2020 election and the storming of the U.S. Capitol on January 6, 2021.  Mr. Cole's photographs of these events have gained him international recognition and have been published by *Rolling Stone*, *Esquire*, *New York Magazine*, *The Inquirer*, *The Atlantic*, CNN, the BBC, and *National Geographic*.  In November

2021 Mr. Cole published a compilation of his protest photography entitled Mel D. Cole: American Protest: Photographs 2020–2021.  The same month he was named 2021 Editorial/Press Photographer of the Year by the International Photography Awards.

12.     Plaintiff Amr Alfiky is a professional visual journalist, documentary photographer and filmmaker based in New York City Mr. Alfiky was born in Kuwait and studied medicine at Alexandria University in Egypt.  Starting in 2011, while he was still a student, Mr. Alfiky began serving as a frontline medic during the Egyptian revolution.  Mr. Alfiky continued to assist as a medic for approximately three years, during which time he was repeatedly arrested and tortured by the Egyptian police.  In 2014, Mr. Alfiky traveled to the United States for a holiday, but while he was here the Egyptian government reopened a politically motivated case against him and he was unable to return.  Over the course of several years, he worked his way from asylum-seeker to earn accolades as a professional visual journalist.  Mr. Alfiky has been selected to participate in *The New York Times* Portfolio Review, Eddie Adams Workshop and Missouri Photo Workshop.  He has regularly contributed photographs to Reuters and *The New York Times*, and his work has also been featured in *TIME*, *The Guardian*, *The Atlantic*, *Huffington Post* and other major international publications.  Mr. Alfiky holds a Master of Arts in Journalism from the Craig Newmark Graduate School of Journalism at CUNY, and has worked at the Magnum Foundation, the International Center of Photography, National Public Radio, the Associated Press, and ABC News.  From June 2020 to June 2021, Mr. Alfiky was a photography fellow at *The New York Times*, and from June 2021 to June 2022 he was a photography resident at *National Geographic*. Mr. Alfiky is currently a staff photographer for *Reuters*.   Mr. Alfiky has held an NYPD-issued press pass since 2017.  He is a lawful permanent resident of the United States.

13.     Defendant the City of New York ("New York City" or the "City") is a municipality of New York State.  The NYPD is an administrative arm of New York City. Defendant New York City is responsible for the administration and operation of the NYPD and charged with the employment, control, supervision, discipline and training of NYPD personnel and employees and with formulation of policies, customs and practices governing NYPD personnel and employees.

14.     Although not named as a defendant, Bill de Blasio is and was at all times relevant to this Complaint the Mayor of the City of New York, with executive policymaking authority over the NYPD.

15.     Although not named as a defendant, Dermot F. Shea is and was at all times relevant to this Complaint the New York City Police Commissioner, responsible for policymaking and oversight at the NYPD.

16.     Defendant NYPD Officer Nicholas Terrett was at all times relevant to this Complaint a duly assigned officer of the NYPD working out of the 1st Precinct in Manhattan, New York.  Defendant Terrett's actions as alleged in this Complaint were taken under color of the laws of the State of New York and of New York City.  Upon information and belief, Defendant Terrett is a resident of New York City.  Defendant Terrett is sued in his individual and official capacities.

17.     Defendant NYPD Officer Luigi Tirro was at all times relevant to this Complaint a duly assigned officer of the NYPD working out of the 1st Precinct in Manhattan, New York. Defendant Tirro's actions as alleged in this Complaint were taken under color of the laws of the State of New York and of New York City.  Upon information and belief, Defendant Tirro is a resident of New York City.  Defendant Tirro is sued in his individual and official capacities.

18.     Defendant NYPD Officer Adam Muniz was at all times relevant to this Complaint a duly assigned officer of the NYPD working out of the 1st Precinct in Manhattan, New York. Defendant Muniz's actions as alleged in this Complaint were taken under color of the laws of the State of New York and of New York City.  Upon information and belief, Defendant Muniz is a resident of New York City.  Defendant Muniz is sued in his individual and official capacities.

19.     Defendant NYPD Officer Leonel Giron was at all times relevant to this Complaint a duly assigned officer of the NYPD working out of the 1st Precinct in Manhattan, New York. Defendant Giron's actions as alleged in this Complaint were taken under color of the laws of the State of New York and of New York City.  Upon information and belief, Defendant Giron is a resident of New York City.  Defendant Giron is sued in his individual and official capacities.

20.     Defendant NYPD Deputy Inspector Stephen Spataro was at all times relevant to this Complaint a duly assigned supervising officer of the NYPD.  Defendant Spataro's actions as alleged in this Complaint were taken under color of the laws of the State of New York and of New York City.  Upon information and belief, Defendant Spataro is a resident of New York City.  Defendant Spataro is sued in his individual and official capacities.  On the night of May 30, 2020, Defendant Spataro was wearing a white NYPD uniform shirt and a helmet bearing the shield number 15519, as shown in the screen shot below:

Case 1:21-cv-06610-CM   Document 123   Filed 03/10/23   Page 10 of 85



21.     Defendant NYPD Lieutenant Daniel Gallagher, believed to now be retired, was at all times relevant to this Complaint a duly assigned officer of the NYPD Legal Bureau. Defendant Gallagher's actions as alleged in this Complaint were taken under color of the laws of the State of New York and of New York City.  Upon information and belief, Defendant Gallagher is a resident of New York City.  Defendant Gallagher is sued in his individual and official capacities.

22.     Defendant NYPD Lieutenant Robert Cattani, was at all times relevant to this Complaint a duly assigned officer of the NYPD.  Defendant Cattani's actions as alleged in this Complaint were taken under color of the laws of the State of New York and of New York City. Upon information and belief, Defendant Cattani is a resident of New York City.  Defendant Cattani is sued in his individual and official capacities.

23.     Defendant NYPD Captain Gzim Palaj was at all times relevant to this Complaint a duly assigned officer of the NYPD, then bearing the rank of Lieutenant.  Defendant Palaj's

actions as alleged in this Complaint were taken under color of the laws of the State of New York and of New York City.  Upon information and belief, Defendant Palaj is a resident of New York City.  Defendant Palaj is sued in his individual and official capacities.

24.     Defendant NYPD Officer Brianna Carlo was at all times relevant to this Complaint a duly assigned officer of the NYPD working in Strategic Response Group 5 in Staten Island, New York.  Defendant Carlo's actions as alleged in this Complaint were taken under color of the laws of the State of New York and of New York City.  Upon information and belief, Defendant Carlo is a resident of New York City. Defendant Carlo is sued in her individual and official capacities.

25.     Defendant NYPD Sergeant Christopher B. Hewitson was at all times relevant to this Complaint a duly assigned officer of the NYPD working out of the 18th Precinct in Manhattan, New York.  Defendant Hewitson' s actions as alleged in this Complaint were taken under color of the laws of the State of New York and of New York City.  Upon information and belief, Defendant Hewitson is a resident of  New York City.  Defendant Hewitson is sued in his individual and official capacities.

26.     Defendant NYPD Officer Christopher Radzinski was at all times relevant to this Complaint a duly assigned officer of the NYPD working out of the 42nd Precinct in Bronx, New York and/or the Narcotics Bureau Bronx Major Case Unit.  Defendant Radzinski's actions as alleged in this Complaint were taken under color of the laws of the State of New York and of New York City.  Upon information and belief, Defendant Radzinski is a resident of New York City.  Defendant Radzinski is sued in his individual and official capacities.

27.     Defendant NYPD Officer Sean P. Robinson was at all times relevant to this Complaint a duly assigned officer of the NYPD working out of the 7th Precinct in Manhattan,

New York.  Defendant Robinson's actions as alleged in this Complaint were taken under color of the laws of the State of New York and of New York City.  Upon information and belief, Defendant Robinson is a resident of New York City.  Defendant Robinson is sued in his individual and official capacities.

28.     Defendant Sergeant Daniel Slevin was at all times relevant to this Complaint, a duly assigned officer of the NYPD working out of the 7th precinct in Manhattan. Defendant Slevin's actions as alledged in this Complaint were taken under color of the laws of the State of New York and of New York City. Upon information and belief, Defendant Slevin is a resident of New York City. Defendant Slevin is sued in his individual and official capacities.

29.     Defendant NYPD Lieutenant Keith Hockaday was at all times relevant to this Complaint a duly assigned officer of the NYPD Strategic Response Group, then bearing the rank of Sergeant.  On the night of May 29, 2020, Defendant Hockaday was dispatched to the area surrounding Barclay's Center in Brooklyn, New York.  The actions of Defendant Hockaday as alleged in this Complaint were taken under color of the laws of the State of New York and of New York City.  Upon information and belief, Defendant Hockaday is a resident of New York City.  Defendant Hockaday is sued in his individual and official capacities.

### III.     JURISDICTION AND VENUE

30.     This action is brought pursuant to 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments to the United States Constitution.  This Court has subject matter jurisdiction over all federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), and has supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367.

Case 1:21-cv-06610-CM   Document 123   Filed 03/10/23   Page 13 of 85

31.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in this District and, additionally, because many defendants reside in this District.

## IV.     COMPLIANCE WITH PRE-SUIT REQUIREMENTS

32.     On October 15, 2020, within the limitations period after the claims herein arose,[3] Mr. Gray served a Notice of Claim on New York City in compliance with N.Y. Gen. Mun. Law § 50-e.  On November 10, 2020, New York City served Mr. Gray with a Demand for Examination pursuant to N.Y. Gen. Mun. Law § 50-h.  Mr. Gray's examination took place on February 5, 2021.

33.     On October 15, 2020, within the limitations period after the claims herein arose, Mr. Donnelly served a Notice of Claim on New York City in compliance with N.Y. Gen. Mun. Law § 50-e.  On November 10, 2020, New York City served Mr. Donnelly with a Demand for Examination pursuant to N.Y. Gen. Mun. Law § 50-h.  Mr. Donnelly's examination took place on December 16, 2020.

34.     On October 15, 2020, within the limitations period after the claims herein arose, Ms. Alhindawi served a Notice of Claim on New York City in compliance with N.Y. Gen. Mun. Law § 50-e.  On November 10, 2020, New York City served Ms. Alhindawi with a Demand for Examination pursuant to N.Y. Gen. Mun. Law § 50-h.  Ms. Alhindawi's examination took place on December 11, 2020.

---

[3] In early 2020, as part of a set of measures to address the COVID-19 public health emergency, Governor Cuomo issued a series of Executive Orders, beginning with E.O. 202.8, which tolled "any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding, as prescribed by the procedural laws of the state [of New York]" starting March 20, 2020.  This tolling period was extended numerous times and expired on November 3, 2020 (E.O. 202.67; E.O. 202.72).

35.     On October 15, 2020, within the limitations period after the claims herein arose, Mr. Cole served a Notice of Claim on New York City in compliance with N.Y. Gen. Mun. Law § 50-e.  On November 10, 2020, New York City served Mr. Cole with a Demand for Examination pursuant to N.Y. Gen. Mun. Law § 50-h.  Mr. Cole's examination took place on December 21, 2020.

36.     On December 29, 2020, within the limitations period after the relevant claims herein arose, Mr. Alfiky served a first Notice of Claim on New York City concerning the events that took place on February 11, 2020 (the "February 2020 Incident") in compliance with N.Y. Gen. Mun. Law § 50-e.  On January 25, 2021, within the limitations period after the relevant claims herein arose, Mr. Alfiky served a second Notice of Claim on New York City concerning the events that took place on May 29, 2020 (the "May 2020 Incident") in compliance with N.Y. Gen. Mun. Law § 50-e.  On May 18, 2021, New York City served Mr. Alfiky with Demands for Examination pursuant to N.Y. Gen. Mun. Law § 50-h relating to both notices of claim.  Mr. Alfiky's examinations with respect to the February 2020 Incident and the May 2020 Incident both took place on June 2, 2021.

37.     This action has been commenced within the applicable limitations period for the claims asserted herein.

## V.     FACTUAL BACKGROUND

### A.     The George Floyd Protests

**Background of the Protests**

38.     On May 25, 2020 in Minneapolis, Minnesota, George Floyd, an unarmed Black man, was arrested on suspicion of passing a counterfeit $20 bill.  During the course of the arrest, Mr. Floyd was pinned down by a police officer named Derek Chauvin.  Officer Chauvin leaned

his knee on Mr. Floyd's neck for nearly ten minutes, even after Mr. Floyd lost consciousness, as bystanders pleaded for him to stop.  Mr. Floyd died.  A bystander video of Mr. Floyd's death circulated widely in the days following, sparking widespread outrage.[4]

39.     These events occurred in the larger context of the COVID-19 pandemic.  In late May of 2020, the U.S. COVID-19 outbreak ravaged New York City, and resulted in a massive and lingering blow to the city's economy.  Data showed that the disease was disproportionately affecting New Yorkers of color.  Adding to the strain, "essential workers" who were asked to continue exposing themselves to the virus for the sake of the larger community were also disproportionately people of color.

40.     New York City had also put in place strict social distancing guidelines, as well as a mandate that masks be worn in public.  Numerous reports and videos emerged showing NYPD officers aggressively, and sometimes violently, policing social distancing and mask rules against New Yorkers of color, but not against white New Yorkers.  Data showed that the vast majority of arrests for failure to observe social distancing guidelines were of Black New Yorkers.[5]

**The New York City Protests**

41.     Within days after George Floyd's death, mass protests began in cities throughout the United States and the world, consolidating support behind the Black Lives Matter movement. The protests largely focused on longstanding and seemingly intractable patterns of discriminatory policing and systemic racism.

---

[4] On April 20, 2021, Office Chauvin was convicted by a jury of second-degree unintentional murder, third-degree murder and second-degree manslaughter.  *See* Laurel Wamsley, *Derek Chauvin Found Guilty Of George Floyd's Murder*, NPR (Apr. 20, 2021), www.npr.org/sections/trial-over-killing-of-George-Floyd/ 2021/04/20/987777911.

[5] *See* Press Release, N.Y. Att'y General, *AG James Calls on the NYPD to Ensure Equal Social Distancing Enforcement in NYC Communities* (May 13, 2020), https://ag.ny.gov/press-release/2020/ag-james-calls-nypd-ensure-equal-social-distancing-enforcement-nyc-communities; Ashley Southhall, *Scrutiny of Social-Distance Policing as 35 of 40 Arrested Are Black*, N.Y. TIMES (May 7, 2020), https://www.nytimes.com/2020/05/07/nyregion/nypd-social-distancing-race-coronavirus.html.

42.     The New York City protests began on Thursday, May 28, 2020, with hundreds gathering in Union Square Park in Manhattan and marching downtown.[6]  On May 29, 2020, protests were scheduled to take place at 4:00 p.m. in Lower Manhattan and at 6:00 p.m. at Barclays Center in Brooklyn.[7]  Thousands of protestors gathered at Barclays Center, and at approximately 8:00 p.m., police began ordering the protestors to disperse.[8]

43.     At approximately 8:45 p.m. on May 29, a protestor named Dounya Zayer was filming NYPD Officer Vincent D'Andraia with her cellphone, as he and other NYPD officers marched down a street near Barclays Center, clearing protestors.  D'Andraia told Zayer to move out of the way, and when she asked why, D'Andraia smacked Zayer's cellphone out of her hand, called her a "stupid bitch," and shoved her with both hands, sending her flying across the street and into the curb.[9]  D'Andraia continued walking.  His supervisor, who was walking with him and witnessed the entire altercation, did nothing.[10]  Zayer was hospitalized for a seizure and concussion.  Only after a video of the altercation recorded by a *Newsweek* reporter went viral on the internet did the NYPD take any steps to discipline D'Andraia.[11]

44.     As the evening of May 29 wore on, the protests turned increasingly tense.  Some protestors tossed water bottles at police, vandalized and damaged police vehicles, and lit fires in

---

[6] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd* 9 (July 2020), *available at* https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf (hereinafter "Attorney General's Report").

[7] *Id.* at 10.

[8] *Id.*

[9] Tina Moore, Georgett Roberts, and Lia Eustachewich, *NYPD officer caught shoving female protester charged with assault*, N.Y. POST (June 9, 2020), https://nypost.com/2020/06/09/nypd-officer-caught-shoving-protester-charged-with-assault/.

[10] Attorney General's Report, *supra* note 6, at 10.

[11] Ashley Southhall, *Officer Who Violently Shoved Protestor in Brooklyn Is Charged With Assault*, N.Y. TIMES (June 9, 2020), https://www.nytimes.com/2020/06/09/nyregion/nypd-officer-vincent-dandraia-arrest.html.

the street.  Police, for their part, turned aggressive attention to groups of protestors engaged in vandalism as well as other groups of peaceful protestors, indiscriminately charging crowds, swinging batons, and deploying pepper spray.[12]

45.     On Saturday, May 30, peaceful protests took place in numerous locations throughout the five boroughs of New York City, including at Union Square.[13]  As the day wore on, the protests again turned tense, with reports of violence by both protestors and police.[14] Before nightfall, NYPD officers began pepper spraying and indiscriminately arresting protestors gathered near Union Square, and protestors in that area, for their part, smashed and lit multiple police cars on fire.[15]  Later that night, dozens of stores in Lower Manhattan were burglarized.[16] The NYPD reported 47 damaged police cars and 33 injured police officers on May 30.[17]

46.     Like the day before, May 31 began with widespread peaceful protests across all five boroughs.  However, as the day wore on, tensions began once again to rise.  Protestors remained in the streets until late at night, and gathered en masse to shut down roadways and bridges.[18]  Confrontations erupted, and police began using pepper spray and batons, aggressively dispersing crowds, and arresting protestors.[19]  Late that night, smaller groups apparently unaffiliated with the peaceful protests gathered in lower Manhattan, smashing windows and

---

[12] Attorney General's Report, *supra* note 6, at 10.

[13] *Id.* at 11.

[14] *Id.*

[15] *Id.* at 12.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

burglarizing luxury goods stores.[20]  Near Union Square in Manhattan, a police officer was filmed pointing his gun at groups of unarmed protestors and charging toward them, before walking back to his supervisor, who had been watching.  The video was posted by a reporter for Gothamist.com.[21]  Only after the video circulated widely was the officer disciplined.[22]

47.    On June 1, Governor Cuomo and Mayor De Blasio announced an 11 p.m. curfew for New York City.[23]  Essential workers – *including members of the news media* – were exempt from the curfew order.[24]

48.    During the day of June 1, peaceful protests continued.  As night fell, groups unaffiliated with the protests again flooded the city's retail districts and began burglarizing stores, particularly in the hours leading up to the curfew.[25]  Members of the news media reported on these events, and captured images of smashed storefronts, street fires, and mayhem.  Nevertheless, when 11 p.m. passed, members of the media were also targeted for curfew enforcement.  Numerous reports emerged of NYPD officers physically assaulting and/or arresting members of the media even though they were openly displaying press credentials.[26]

---

[20] *Id.* at 13.

[21] Jake Offenhartz (@jangelooff), Twitter (June 1, 2020, 12:31 AM), https://twitter.com/jangelooff/status/1267308341660979200.

[22] *After Widespread Looting, Curfew Is Moved Up to 8 PM*, N.Y. TIMES (June 6, 2020), https://www.nytimes.com/2020/06/01/nyregion/nyc-protests-george-floyd.html.

[23] 23 N.Y.C. Exec. Order No. 117 (June 1, 2020).

[24] *See* 24 N.Y. Exec. Order No. 202.6 § 3 (Mar. 18, 2020) (defining essential workers to include "news media").

[25] Attorney General's Report, *supra* note 6, at 15.

[26] *Police Target Journalists as Trump Blames 'Lamestream Media' for Protests*, N.Y. TIMES (June 1, 2020), https://www.nytimes.com/2020/06/01/business/media/reporters-protests-george-floyd.html; Associated Press, *Police Shove, Make AP Journalists Stop Covering Protest* (June 3, 2020), https://apnews.com/article/us-news-new-york-city-manhattan-ny-state-wire-journalists-1d2d9e4afdd822b27bfcce570e0cbdb5.

49.     In response to the reports of violence and vandalism on June 1, Mayor De Blasio moved the curfew up to 8 p.m., and extended it for a week.[27]  Once again, members of the news media were exempt from the curfew.

50.     Protests continued on June 2.  In peaceful defiance of the Mayor's curfew order, many protestors stayed on the streets past 8 p.m.  The NYPD allowed some groups to protest peacefully, while police employed blockades, pepper spray, and batons against other groups.[28]  Once again, members of the press openly wearing their credentials were beaten and detained, despite being explicitly exempted from the Mayor's curfew order.[29]

51.     Protests continued in New York City throughout the weeklong curfew period.  There were numerous reports of reporters and photographers, as well as legal observers and medics, being arrested for curfew violations despite being exempt from the curfew.[30]

52.     Eventually the protests began to subside, but they did not end.  An "occupy" encampment was set up at City Hall, and protest events of various sizes continued to be held.  A June 14 protest in support of Black trans rights drew a crowd of thousands.[31]  And in late June and July, pro-police rallies were held, in turn drawing counter-protests.[32]  On July 15, a group of Black Lives Matter protestors were gathered on the Brooklyn Bridge to meet a planned "prayer

---

[27] *Id.* at 15.

[28] *Id.* at 16.

[29] *See, e.g., Police shove, make AP journalists stop covering protest*, ASSOCIATED PRESS (June 3, 2020), https://apnews.com/article/us-news-new-york-city-manhattan-ny-state-wire-journalists-1d2d9e4afdd822b27bfcce570e0cbdb5.

[30] Attorney General's Report, *supra* note 6, at 17.

[31] Anushka Patil, *How a March for Black Lives Became a Huge Event*, N.Y. TIMES (June 15, 2020), https://www.nytimes.com/2020/06/15/nyregion/brooklyn-black-trans-parade.html.

[32] Juliana Kim and Michael Wilson, *'Blue Lives Matter' and 'Defund the Police' Clash in the Streets*, N.Y. TIMES (July 22, 2020), https://www.nytimes.com/2020/07/22/nyregion/ny-back-the-blue-lives-matter-rallies.html.

Case 1:21-cv-06610-CM   Document 123   Filed 03/10/23   Page 20 of 85

march" to City Hall, which had been joined by hundreds of pro-police marchers.[33]  As the NYPD cleared the bridge roadway of the counter-protestors, clashes broke out.  Police forcibly arrested a number of protestors, and one protestor attacked police officers with a cane.[34]

**Compiled Press and Bystander Videos Show Dozens of Instances of NYPD Officers Using Force Against Protestors**

53.     On July 14, 2020, *The New York Times* published a trove of 60 videos shot by protestors and journalists, showing NYPD officers repeatedly using force on protestors during the first ten days of the George Floyd Protests.[35]  The report noted that, "[i]n instance after instance, the police are seen using force on people who do not appear to be resisting arrest or posing an immediate threat to anyone."[36]

54.     According to *The New York Times*, as of July 14, 2020, only four NYPD officers had been disciplined by the NYPD for misconduct during the George Floyd Protests.[37]

55.     Upon information and belief, these four officers were only disciplined because their misconduct had been captured through photography and videography and widely disseminated by members of the media and of the public, and no disciplinary action was taken until after these photographs and videos were widely disseminated.

---

[33] Jake Offenhartz, *Blue Lives Matter Protesters And NYPD "Hijacked" A Black-Led Prayer March, Organizers Say*, GOTHAMIST (July 15, 2020, 4:30 PM)**,** https://gothamist.com/news/blue-lives-matter-protesters-and-nypd-hijacked-black-led-prayer-march-organizers-say.

[34] Allison McCann, Blacki Migliozzi, Andy Newman, Larry Buchanan, and Aaron Byrd, *N.Y.P.D. Says It Used Restraint During Protests. Here's What the Videos Show*, N.Y. TIMES (July 14, 2020), https://www.nytimes.com/interactive/2020/07/14/nyregion/nypd-george-floyd-protests.html.

[35] Kim and Wilson, *supra* note 32.

[36] *Id.*

[37] *Id.*

**B.      The Plaintiffs were Targeted, Assaulted, and/or Arrested for Photographing Police Activity**

56.      The Plaintiffs are all professional visual journalists who were engaged in photographing the George Floyd Protests and other events taking place in public when they were targeted, assaulted, and/or arrested by NYPD officers.  In each instance, the NYPD officers involved were aware, or should have been aware, that Plaintiffs were engaged in newsgathering.

57.      Each of these instances demonstrate the NYPD's disregard for the Plaintiffs' rights, and exemplify a police culture in which NYPD officers routinely target and retaliate against journalists and members of the public for engaging in constitutionally protected activity – namely, the peaceful recording of police activity taking place in public.

**The Unlawful Assault, Arrest, and Detention of Adam Gray**

58.      On the night of May 30, 2020, Mr. Gray was on assignment for news outlet *The U.S. Sun*, covering the George Floyd Protests.  Mr. Gray read in an online report that there was police activity around 13th Street and walked to that area to photograph events.

59.      As he was walking west down 13th Street in the vicinity of Union Square, Mr. Gray came upon a large group of protestors who were facing off against a police line further west down 13th Street.  Mr. Gray saw the NYPD rushing the crowd, grabbing protestors from the front of the line, pulling them back, and arresting them.  From his position behind and to the side of the front of the protestor line, Mr. Gray began photographing these events.

60.      Mr. Gray did not interfere with police activity in any way, did not cross police lines, and was not asked or instructed to move.  Mr. Gray was wearing three cameras hanging off his neck and shoulders, a backpack containing a laptop, and his U.S. State Department-issued press credentials on a lanyard around his neck, making his status as a journalist visibly apparent.

21

61.     As Mr. Gray was in the midst of photographing, NYPD Officer Luigi Tirro rushed at Mr. Gray suddenly and without warning.  Officer Tirro forcibly pushed Mr. Gray to the ground.  NYPD Lieutenant Cattani then stepped in, pulling Mr. Gray from sidewalk, and, along with Officer Tirro, restrained him.  Mr. Gray was quickly surrounded by several additional NYPD officers, who included, upon information and belief, NYPD Officer Nicholas Terrett.  Mr. Gray was placed in handcuffs.  NYPD Officer Leonel Giron and NYPD Officer Adam Muniz ultimately re-cuffed and detained Mr. Gray.  Mr. Gray told all these officers repeatedly and clearly that he was a member of the press, and asked them to look at his press credentials that were hanging around his neck.  Mr. Gray's requests were ignored.

62.     The photograph below shows Mr. Gray following his arrest.  Two cameras and the lanyard with Mr. Gray's press credentials are clearly visible hanging around his neck. Another camera with a telephoto lens can be seen hanging behind his right leg.



63.     After Mr. Gray had been initially handcuffed, NYPD Lieutenant Daniel Gallagher, approached.  Mr. Gray again said he was a member of the press and indicated the press credentials hanging around his neck.  Lieutenant Gallagher responded, "there are no press privileges in unlawful assembly."  Lieutenant Gallagher then approached an officer who appeared to be writing down notes on Mr. Gray's arrest and said, "add this."  Lieutenant Gallagher instructed the officers to "take him" (meaning Mr. Gray) and charge him with unlawful assembly despite being fully aware Mr. Gray was a member of the media.  Upon information and belief, NYPD Deputy Inspector Spataro also supervised Mr. Gray's arrest and participated in these exchanges.

64.     Mr. Gray, who was wearing an N-95 mask, was handed off to NYPD Officer Giron, who accompanied Mr. Gray for booking and processing.  Mr. Gray's laptop and cameras were seized, he was placed in a police vehicle with numerous other arrestees (many of whom were not wearing masks), and transported to One Police Plaza, Manhattan.  Mr. Gray was detained for approximately eight hours in a packed holding cell containing dozens of people, most of whom were not wearing masks.  Ultimately, Mr. Gray was issued a desk appearance ticket indicating he was being charged with Unlawful Assembly pursuant to New York Penal Law Section 240.10 and released.  There was no probable cause to charge Mr. Gray with this offense.

65.     The Manhattan District Attorney's office subsequently issued a notice, backdated to May 31, 2020, that it would decline to prosecute the charge against Mr. Gray.

**The Unlawful Arrest and Detention of Jemell D. Cole**

66.     On the morning of July 15, 2020, Mr. Cole was on the Brooklyn Bridge footpath, intending to photograph a pro-police march that was scheduled to cross the Brooklyn Bridge into

23

Manhattan via the roadway.  Before the march arrived, counter-protestors entered the Brooklyn

Bridge roadway from the Manhattan side.  At approximately 10:30 a.m., clashes erupted between

police and counter-protestors, and spilled from the roadway onto the footpath, where Mr. Cole

was already positioned.

67.    Mr. Cole photographed these events on the footpath without interfering with

policy activity, and at a safe distance from the scrum of conflict between protestors and police.

Mr. Cole was not asked to leave the scene by police.

68.    When the clashes subsided and there was no ongoing violence, Mr. Cole remained

standing on the footpath.  Mr. Cole had not participated in the counter-protests, had been

peacefully photographing from a position outside the conflict, and was wearing multiple

professional cameras around his neck and shoulder, making his status as a photojournalist visibly

apparent.

69.    Nevertheless, NYPD Captain (then Lieutenant) Palaj instructed NYPD Officer

Carlo to arrest Mr. Cole.  Mr. Cole informed both Officer Carlo and Captain Palaj that he was a

journalist engaged in documenting events.  Captain Palaj told Mr. Cole that while the NYPD

couldn't "lock up" people with "press passes," because Mr. Cole did not have a press pass he

would be charged with "failure to disperse."  Police records indicate the contemplated charge

against Mr. Cole was recorded as unlawful assembly.  There was no probable cause to charge

Mr. Cole with this offense.  Mr. Cole noted to Captain Palaj that it was "obvious" he was a

photographer due to the multiple professional cameras hanging off of him, but was told this did

not matter.  Other members of the public who were standing in the vicinity of Mr. Cole, but who

were not taking photographs, were not arrested.

70.    The photograph below shows Mr. Cole and NYPD Officer Carlo, just after Mr. Cole was arrested.  The photograph shows that Mr. Cole was wearing two professional cameras around his neck and shoulder and a KN95 mask when he was arrested.



71.    After his arrest, Mr. Cole's cameras were seized, and he was placed in a police vehicle with numerous others and transported to One Police Plaza in Manhattan, where he was processed.  Mr. Cole was then transported to the 5th Police Precinct and placed in a holding cell.

72.    After several hours, Mr. Cole was taken out of the holding cell to speak to NYPD Sergeant Patrick E. Quigley.  Sergeant Quigley told Mr. Cole that the NYPD knew that Mr. Cole had not been involved in any criminal act and should not have been arrested.  Sergeant Quigley also told Cole that he was "lucky" that he was "not going to be locked up all weekend" and indicated Mr. Cole should "thank" Sergeant Quigley and the NYPD for "putting their necks on the line" for him.  As Sergeant Quigley was talking, he pulled down Mr. Cole's mask, apparently

to emphasize the "man to man" nature of the conversation.  Sergeant Quigley was not wearing a mask.

73.     Notwithstanding the NYPD's knowledge and admission that Mr. Cole had done nothing wrong, he was transported back to One Police Plaza and held for several more hours. After approximately seven hours of detention, Mr. Cole's cameras were returned to him and he was released without charge.  Mr. Cole was provided no documentation upon his release.

**The Unlawful Assault of Jae Donnelly**

74.     On June 2, 2020, Mr. Donnelly was on assignment for *The Daily Mail*, photographing the George Floyd Protests taking place in Manhattan.  Mr. Donnelly was following a group of protestors who had stayed out past the city-mandated curfew of 8:00 p.m. Mr. Donnelly, as a member of the media, was exempt from that curfew.  Mr. Donnelly was carrying his camera kit and wore his U.S. State Department-issued press credentials around his neck, making his status as a journalist visibly apparent.

75.     As he reached the corner of West 53rd Street and 9th Avenue at approximately 9:30 p.m., Mr. Donnelly saw police forcibly arresting a protestor on the northeast corner of the intersection.  Mr. Donnelly began photographing these events.  As Mr. Donnelly was photographing, a police officer rushed at him from the east, and struck him in the face.  Upon information and belief, this officer was NYPD Sergeant Christopher Hewitson.

76.     After being hit, Mr. Donnelly retreated backward, south across West 53rd Street, repeatedly declaring he was a member of the media, and holding up his press pass.  Sergeant Hewitson nonetheless pursued Mr. Donnelly into the street and shoved him again with such force that Mr. Donnelly landed on the ground several feet away.

77.    The images below, taken from two videos of these events, show Sergeant
Hewitson hitting Mr. Donnelly a first time, pursuing Mr. Donnelly with a baton drawn as Mr.
Donnelly retreated and turned back to hold up his press pass, then hitting Mr. Donnelly a second
time, knocking him to the ground, and leaving him there.











78.    Mr. Donnelly had not interfered with police activity in any way, had not crossed
police lines, and had not been asked or instructed to move prior to being assaulted by Sergeant
Hewitson.

79.    As a result of this assault, Mr. Donnelly suffered abrasions and large bruises on
his arms and legs, head trauma, and a hematoma on his cheek.  Mr. Donnelly's camera
equipment was also seriously damaged.  Mr. Donnelly was not able to take photography
assignments for weeks, until his lenses were repaired.  Mr. Donnelly's camera has still not been
fully repaired.

80.    Sergeant Hewitson has not been disciplined for his actions.

**The Unlawful Assault of Diana Zeyneb Alhindawi**

81.     On the night of May 31 and morning of June 1, 2020, Ms. Alhindawi was in lower Manhattan, following and photographing widespread looting that had erupted in New York City.  At approximately 3:00 a.m. on June 1, Ms. Alhindawi came upon a Foot Locker store at 440 Broadway which had been broken into.  The store window had been smashed and its interior security gate had been pried up.  Ms. Alhindawi saw that, inside the store, several NYPD officers had surrounded a young man and were beating him.  Ms. Alhindawi began photographing these events, taking a position near the store window and to the left of the security gate.  Several other professional photographers were gathered in the same spot, attempting to photograph the events inside the Foot Locker store.  Ms. Alhindawi and the other photographers were then directed by NYPD officers on the scene to move back from the window.  Ms. Alhindawi and the other photographers promptly complied with this directive and moved back to the opposite edge of the sidewalk.

82.     At the time of these events, Ms. Alhindawi was carrying a camera and wearing a press pass around her neck, making her status as a journalist visibly apparent.  Her press pass was issued by the Frontline Freelance Register, an internationally recognized membership organization that issues press credentials to "professional and active [freelance] journalists who abide by a recognised industry code of conduct."[38]

83.     Four NYPD officers, including NYPD Officer Christopher Radzinski, stood in front of the Foot Locker store as these events unfolded, facing the sidewalk.  Ms. Alhindawi and the other photographers were approximately six feet away from NYPD Officer Radzinski and the other officers.  Ms. Alhindawi's position relative to these officers can be seen from the

---

[38] *See* Press Cards, Frontline Freelance Register, *available at* https://www.frontlinefreelance.org/press-cards/.

photograph below, which Ms. Alhindawi took prior to her assault. The photograph  shows, from

the perspective of the viewer,  Officer Radzinski second from the left.



84.     Ms. Alhindawi was staring down at the tilted-up view screen of her camera,

focusing on getting her shot, when, without warning, NYPD Officer Radzinski charged across

the sidewalk to the group of photographers.  NYPD Officer Radzinski swung his baton at Ms.

Alhindawi, striking Ms. Alhindawi in the face and splitting her lip open.  NYPD Officer

Radzinski then returned to stand in front of the Foot Locker store.

85.     Prior to being assaulted, Ms. Alhindawi had not interfered with police activity in

any way and did not cross police lines.

**The Unlawful Assault, Arrest and Detention of Amr Alfiky in February 2020**

86.     On the evening of February 11, 2020, Plaintiff Alfiky was in the Lower East Side

of Manhattan meeting a friend.  At approximately 7:00 p.m., in the vicinity of 134 Division

Street, Mr. Alfiky witnessed two police officers chase, tackle, and forcibly arrest a man who

appeared to be in mental distress, and who was shirtless in freezing weather.  Mr. Alfiky judged

these events to be a matter of public concern, and he began photographing the arrest using his

cell phone camera.  Other bystanders also began filming the arrest with their phones.

87.     Mr. Alfiky was initially positioned approximately six feet from the arrest, but after being asked by NYPD officers to move back, Mr. Alfiky moved to the sidewalk on the other side of Division Street and continued to record the arrest using his phone camera.  NYPD Officer Sean P. Robinson arrived shortly thereafter and told the bystanders to stay back.  Mr. Alfiky was more than 20 feet from the arrest in progress and was not interfering with police activity in any manner.  Mr. Alfiky then stepped off the curb into the space between two parked cars to get a better vantage point to record the arrest, which was taking place on the opposite sidewalk.

88.     By stepping off the sidewalk, Mr. Alfiky was not obstructing or interfering with police activity.  In fact, Mr. Alfiky was still so far from the arrest in progress that passersby were walking freely between him and the arrest.  The image below is a photograph taken by Mr. Alfiky.  The image shows Officer Robinson standing in front of the man being arrested, who is lying on the ground.  In the right of the image, a passerby can be seen walking freely down the street between Officer Robinson and Mr. Alfiky.



89.     Notwithstanding Mr. Alfiky's distance from the ongoing police activity, Officer Robinson charged across the street to Mr. Alfiky, forcibly grabbed him and dragged him back to the other side of the street where the original arrest was still taking place.

90.     From the outset of this incident, Mr. Alfiky repeatedly told Officer Robinson he was a journalist and offered to produce his NYPD-issued press pass, which was in his backpack. Mr. Alfiky was not permitted to produce his press pass.  Instead, Mr. Alfiky was pushed against a car by Officer Robinson, and surrounded by several other police officers.  Mr. Alfiky was then arrested.  His hands were pulled behind his back and he was handcuffed.  All the while, Mr. Alfiky repeatedly and clearly explained he was a journalist, and offered to show the officers his press pass, but was ignored.  The police officers did not arrest any other bystanders.  Instead, Mr. Alfiky was targeted for arrest merely because he was recording law enforcement activities.

91.     Mr. Alfiky's cell phone, press pass and backpack were seized, and he was taken to the NYPD's 7th Precinct.  He was processed and placed in a holding cell.  Despite repeated requests, Mr. Alfiky was not permitted to make a phone call, and still was not told why he had been arrested.  At one point, an NYPD officer came to the holding cell and said to Mr. Alfiky, "Oh, you were trying to be a man, huh?  Now look, you're in a fucking cell."

92.     Later, NYPD Sergeant Daniel Slevin arrived and asked Mr. Alfiky where his NYPD-issued press pass was.  When Mr. Alfiky said his press pass was in his backpack, Sergeant Slevin retrieved the press pass, asked Mr. Alfiky a number of questions about it, and then confiscated it without explanation, at the direction of NYPD supervisory personnel.  Upon information and belief, Sergeant Slevin and NYPD supervisory personnel confiscated Mr. Alfiky's press pass as retaliation for Mr. Alfiky filming police conduct and asserting his rights to

32

do so.  Following inquiries by an attorney on Mr. Alfiky's behalf, however, Mr. Alfiky's press

pass was ultimately returned to him several days later.

93.     Mr. Alfiky was held at the 7th Precinct for approximately three and a half hours.

He was eventually handed a summons indicating he had been charged with Disorderly Conduct –

Failure to Disperse pursuant to New York Penal Law Section 240.20(6) and released.  There was

no probable cause to charge Mr. Alfiky with this offense.

94.     Before he was released, Mr. Alfiky asked Officer Robinson for his name.  Officer

Robinson responded, "That's not going to happen."

95.     Numerous news outlets reported on Mr. Alfiky's arrest.  When asked for

comment, an NYPD spokesman told reporters, falsely, that Mr. Alfiky had "refused to comply

with repeated requests to step back" and did not identify himself as a journalist until he was in

custody.[39]  A video of Mr. Alfiky's arrest shows him repeatedly and clearly identifying himself

as a journalist before he was handcuffed.  On Mr. Alfiky's Desk Appearance Ticket, Officer

Robinson affirms that Mr. Alfiky stated he was a journalist.

96.     Mr. Alfiky received a notice from the Criminal Court of the City of New York

dated May 18, 2020 informing him that "the NYPD has failed to file a legally acceptable

accusatory instrument with this court" and that, therefore, "there is no reason for you to return to

court on the summons number referenced above."

**The Unlawful Assault of Amr Alfiky in May 2020**

97.     On the night of May 29, 2020, Mr. Alfiky was in Brooklyn photographing the

George Floyd Protests in his professional capacity.  Mr. Alfiky was near Barclays Center near

---

[39] John Annese, *Photojournalist taken into NYPD custody while filming Manhattan arrest*, N.Y. DAILY NEWS (Feb.
2, 2020, 1:18 a.m. EST), https://www.nydailynews.com/new-york/nyc-crime/ny-photojournalist-arrested-manhattan-
20200212-7xm4kebwe5ed7gukrlsfjdpq4e-story.html.

the intersection of Atlantic Avenue and Flatbush Avenue in Brooklyn, where a large group of protestors had gathered.  As Mr. Alfiky was photographing events, clashes began to break out between police and protestors.

98.     Mr. Alfiky has years of experience as a medic during protests in Egypt and has undergone extensive hostile environment training.  He was able to navigate the increasingly tense circumstances without interfering with police activity.  Mr. Alfiky was holding his camera in one hand, photographing, and holding his press pass up in his other hand at eye level, making his status as a journalist visibly apparent.  At no time did Mr. Alfiky interfere with police activity in any way.

99.     As Mr. Alfiky was photographing events, a line of police officers started aggressively charging a group of protestors in an attempt to disperse them.  Mr. Alfiky was being pushed back along with the protestors.  As he moved backwards, Mr. Alfiky continued holding his camera and press pass at eye level, making his status as a journalist visibly apparent to the police officers.  Nevertheless, NYPD Lieutenant (then Sergeant) Keith Hockaday targeted Mr. Alfiky, looked him in the face, and began shouting at him.  Continuing to hold up his press pass, Mr. Alfiky stated clearly and repeatedly "I'm a journalist, I have a press pass."  Lieutenant Hockaday responded "I don't give a fuck about your press pass!" and began forcefully shoving Mr. Alfiky in the chest with his baton.

100.     Lieutenant Hockaday continued menacing Mr. Alfiky and protestors around him by making prohibited overhead strikes with his baton, causing Mr. Alfiky and protestors to retreat backwards.  As a direct result of Lieutenant Hockaday's and other NYPD officers' violent, unjustified, and unconstitutional behavior, Mr. Alfiky tripped and fell, with his back hitting the sidewalk curb.  Mr. Alfiky hit the curb with such force that an approximately one-

inch-wide benign cyst on his back ruptured, flooding its contents into his system.  Mr. Alfiky
was overcome with excruciating pain.

101.    As a result of this assault, Mr. Alfiky suffered fever and infection.  He ultimately
had to undergo medical treatment, including a surgical procedure to clean the infected area in his
back, and an additional procedure to remove the ruptured cyst.  Mr. Alfiky has also suffered back
pain since the assault, which has been evaluated as likely caused by a traumatic incident.

**C.    The NYPD has Engaged in a Widespread Policy, Custom and Practice of
Obstructing and Preventing Journalists and Members of the Public from Recording Police
Activities in Public, and Retaliating Against Those Attempting to Record Police Activities
in Public**

**NYPD Officers Regularly Obstruct and Prevent Journalists and Members of the Public
from Recording Official Activity Open to Public View, Often By Violent Means**

102.    The unlawful arrests and assaults of the Plaintiffs were not isolated incidents.
NYPD officers have repeatedly used unlawful arrests, violence, and other illegal tactics to
prevent members of the media and public from documenting police conduct in public places.
Although these incidents have been documented in decades of civil rights lawsuits, newspaper
articles, social media posts, and correspondence between the media and the NYPD, no
meaningful action has been taken by the City or NYPD in response.

103.    The NYPD's widespread unconstitutional pattern and practice of obstructing
and/or preventing journalists and citizens from filming police activity dates back decades.  In
1977, following a class action lawsuit filed by the New York Civil Liberties Union ("NYCLU"),
the NYPD entered into a consent decree with the NYCLU that specifically acknowledged that
individuals remain free to photograph police activity, even in circumstances where the police are

effecting an arrest, so long as the photographer does not "directly endanger" an "officer or another person."[40]

104.   Despite this consent decree, the NYPD has continued to routinely engage in the unconstitutional practice of obstructing and retaliating against journalists.  After a series of incidents in the 1990s involving NYPD officers physically interfering with journalists' attempts to report the news, the language from the 1977 consent decree regarding the right to record police activity was incorporated verbatim into the 2000 NYPD patrol guide.  However, this change to the NYPD Patrol Guide has been cosmetic only, and the NYPD's widespread practice of interfering with the right of journalists and citizens to record police activity has continued unabated.

105.   Between 2000 and 2011, there were numerous documented instances illustrating the widespread unconstitutional pattern and practice among NYPD officers of obstructing and/or preventing members of the media and other citizens from filming police activity in public locations.  For example:

    a.  Between August 26, 2004 and September 2, 2004, NYPD officers arrested more
        than 1,800 people in connection with protests held during the Republican
        National Convention in New York City, including numerous photographers
        with NYPD-issued press credentials.  The arrestees filed over 80 civil rights
        lawsuits, charging that they had been unlawfully arrested without probable
        cause in mass arrests effected by the NYPD's use of netting on the sidewalk to
        detain large groups of protestors, bystanders, legal observers, and members of

---

[40] NYCLU ACLU of New York, *Black v. Codd (Defending Right to Film or Photograph Police Officers)*, https://www.nyclu.org/en/cases/black-v-codd-defending-right-film-or-photograph-police-officers (last accessed June 16, 2020).

the media all at once.  All cameras seized from arrestees were inventoried as arrest evidence, meaning they were not returned when the arrestees were released from custody.  Tellingly, the Manhattan District Attorney's Office dismissed nearly all criminal prosecutions arising from these arrests.[41]

b.  On February 9, 2005, NYPD officers arrested three activists who were videotaping NYPD officers carrying out two other arrests.  The activists were charged with interfering with police officers engaged in the performance of their duties.[42]

c.  On May 30, 2007, NYPD officers arrested a Manhattan filmographer after he filmed NYPD officers in the East Village as they seized and loaded bikes, which had been locked to lampposts and parking meters, into a police van.  After the filmographer began recording and asked for the officers' names, an officer asked him for identification.  When the filmographer stated that he had the right to film, the officer led him to a police car, examined his ID, then arrested him for disorderly conduct.  A bystander who questioned the filmographer's arrest was then also arrested for disorderly conduct.  The City settled a civil rights lawsuit brought by the two arrested persons for $20,001 each.[43]

---

[41] Second Amended Complaint, *Schiller v. City of New York*, No. 04-07922-RJS-JCF (S.D.N.Y. Dec. 10, 2007), ECF No. 319.

[42] Amended Complaint, *Bandele v. City of New York*, No. 07-3339-MGC (S.D.N.Y. Feb. 29, 2008).  *See also New York: Manhattan: Lawsuit Against The Police*, N.Y. TIMES (Apr. 27, 2007), *available at* https://archive.nytimes.com/query.nytimes.com/gst/fullpage-9C02E2DD123EF934A15757C0A9619C8B63.html.

[43] Glassbeadian, 6th Street Bike Raid, YOUTUBE (Mar, 31, 2010), https://www.youtube.com/watch?v=PnsBw3TiBdE; Colin Moynihan, *City Settles With Two Arrested After Police Confrontation*, N.Y. TIMES (Mar. 21, 2010, 5:46 p.m.), https://cityroom.blogs.nytimes.com/2010/03/31/city-settles-with-pair-arrested-after-police-confrontation.  *Carneval v. City of New York*, No. 08 CV 9993 (DAB) (AJP) (S.D.N.Y.).

106.     In 2011 and 2012, a group of protestors set up camp in Zuccotti Park in Manhattan to call attention to economic inequality.  This "Occupy Wall Street" ("Occupy") protest drew widespread press attention and an oftentimes heavy police presence.  Once again, NYPD officers repeatedly demonstrated the NYPD's widespread unconstitutional pattern and practice of obstructing and/or preventing members of the media and other citizens from filming police activity in public locations, particularly in situations involving public protests.  For example:

    a.     On September 24, 2011, police threw a reporter for WNET's *MetroFocus* against a wall while he was attempting to interview Occupy protesters. The journalist stated that he was holding a microphone and wearing his WNET ID badge at the time, and that he repeatedly yelled to officers, "I'm press, I'm press."[44]

    b.     On November 15, 2011, a night of coordinated police action to evict Occupy protesters from overnight encampments pursuant to a court order ("the eviction"), a reporter stated that she witnessed officers placing another reporter in a "choke-hold."  The witnessing reporter also stated that police were not discriminating between press and protesters.[45]

---

[44] John Farley, *Jailed for Covering the Wall Street Protests: Getting Arrested Alongside Citizen Journalists Gave Me a Taste of the Risks These Non-Professionals Take*, SALON (Sept. 28, 2011), *available at* http://www.salon.com/2011/09/28/wall_street_protest_arrested.

[45] Brian Stelter & Al Baker, *Reporters Say Police Denied Access to Protest Site*, N.Y. TIMES (Nov. 15, 2011), *available at* http://mediadecoder.blogs.nytimes.com/2011/11/15/reporters-say-police-denied-access-to-protest-site/.

c.  On the night of the eviction, NYPD officers prevented 26 journalists from reaching Zuccotti Park, thus also preventing them from documenting police action to remove the Occupy protestors.[46]

d.  On the night of the eviction, a police cordon blocked accredited media from reaching Zuccotti Park.  Members of the media who managed to reach the site reported being arrested, pepper sprayed, and/or treated aggressively by NYPD officers.[47]  Members of the media who were already inside Zuccotti Park at the time of the eviction were told to leave, with a member of the NYPD's DCPI announcing that all credentialed media had to leave immediately or face arrest.  One newspaper photographer for *Mother Jones* magazine was physically dragged out of the park, and told that reporters had to stay in a "press pen."[48]

e.  During the eviction from Zucotti Park, NYPD officers arrested and detained NPR freelance journalist Julie Walker, who was covering the arrests of demonstrators during the eviction.  *The New York Daily News* reported that Walker was wearing her NYPD-issued press pass at the time of her arrest.  The NYPD charged her with disorderly conduct.[49]

---

[46] Second Amended Complaint ¶ 25, *Rodriguez, et al. v. Winski, et al.*, No. 12-03389-NRB (S.D.N.Y. June 7, 2019), ECF No. 241.

[47] Domnic Rushe, *Occupy Wall Street: NYPD attempt media blackout at Zuccotti Park*, THE GUARDIAN (Nov. 15, 2011), https://www.theguardian.com/world/2011/nov/15/occupy-journalists-media-blackout.

[48] *Id.*; Letter from George Freeman, Vice President and Assistant General Counsel, N.Y. Times, to Deputy Commissioner Paul J. Browne, N.Y.P.D. (Nov. 21, 2011), *available at* https://www.rcfp.org/wp-content/uploads/imported/20111121-lettertonypddeputycommissionerforpublicaffairs.pdf.

[49] *Journalists obstructed from covering OWS protests*, COMMITTEE TO PROTECT JOURNALISTS (Nov. 15, 2011, 5:41 p.m. EST), https://cpj.org/2011/11/journalists-obstructed-from-covering-ows-protests/.

Case 1:21-cv-06610-CM   Document 123   Filed 03/10/23   Page 40 of 85

f.   The NYPD arrested *DNAInfo* news editor Patrick Hedlund outside

Zuccotti Park at 4:30 a.m. on the night of the eviction as he was covering

events.  Hedlund had NYPD-issued press credentials.[50]

g.   The NYPD arrested Paul Lomax, a NYPD-credentialed freelance

photographer on assignment for *DNAInfo* at Duarte Square at noon on

November 15, 2011.  He was later released with all charges dropped.[51]

h.   On November 17, 2011, a reporter stated in a video interview that, even

though she was wearing a "clearly marked" press pass, an NYPD officer

struck her in the arm with a baton as she attempted to film police as they

were pushing a barricade into protesters.  Another reporter stated in a

video interview that a third reporter was "slammed against a wall and

taken away in handcuffs" by the NYPD.[52]

i.   On November 17, 2011, a female photographer, who was carrying clearly

visible NYPD-issued press credentials, was taking photos of protestors

near the corner of Pine and Williams Streets.  At one point, an officer

(recognizing that she was a member of the media) advised her to move to

the sidewalk to avoid being caught up in the police action.  As she moved

towards the sidewalk, another officer told her to move to the sidewalk on

the other side of the road.  A short time later, before she got to any

---

[50] Michael P. Ventura, *DNAinfo.com Journalists Arrested While Covering OWS Police Raids*, DNAINFO (Nov. 15, 2011, 1:37 p.m.), https://www.dnainfo.com/20111115/downtown/dnainfo-journalists-arrested-while-covering-ows-police-raids/#ixzz1dnslLPXF (last updated Nov. 16, 2011).

[51] *Id.  See also* Andy Newman & J. David Goodman, *Updates on the Clearing of Zuccotti Park*, N.Y. TIMES (Nov. 15, 2011), http://cityroom.blogs.nytimes.com/2011/11/15/updates-on-the-clearing-of-zuccotti-park.

[52] RT America, *NYPD blast LRAD Sonic weapon against OWS protest*, YOUTUBE (Nov. 17, 2011) https://www.youtube.com/watch?v=jKRQodSK7dU&feature=youtu.be.

sidewalk, a third NYPD officer grabbed her and threw her to the ground, causing her to strike her head on the pavement.[53]

j.    That same day, a different female reporter, also displaying NYPD press credentials, was standing with a group of photographers at a barricade on Cedar Street, between Broadway and Trinity Place, when a group of NYPD police officers moved towards them and started pushing the group back.  One officer, described by the reporter as very tall (approximately 6'5"), shoved the reporter with both his arms, forcing the reporter to fall backwards, landing on her right elbow, and resulting in her yelling in pain. The reporter said the officer then proceeded to pick her up by the collar while yelling, "Stop pretending."  The reporter went to Bellevue Hospital for treatment of her injuries.[54]

k.    On December 12, 2011, NYPD officers arrested numerous citizen journalists who were covering Occupy protest activity in the Winter Garden at Brookfield Place.  NYPD officers also physically prevented Robert Stolarik, a photographer for *The New York Times* who possessed NYPD press credentials, from documenting these arrests.[55]

l.    On December 17, 2011, a journalist for *The Guardian* who was covering Occupy protest activity and wearing press credentials stated that an NYPD officer grabbed him and pushed his fist into the journalist's throat, despite

---

[53] Letter from Freeman, *supra* note 48 at 2.

[54] *Id.*

[55] Second Amended Complaint ¶¶ 40-41, *Rodriguez et al.*, No. 12- 03389-NRB (S.D.N.Y. June 7, 2019), ECF No. 241.

the journalist's repeated cries that he was press.  A *New York Times*
journalist, upon speaking with the *Guardian* journalist, reported that the
officer used the *Guardian* journalist as a "de facto battering ram to push
back protesters."[56]

m.  On December 31, 2011, an NYPD captain "began pushing" a reporter who
was covering an Occupy protest for *The New York Times*.  After the
reporter asked the captain to stop, another officer threatened to yank away
his NYPD-issued press pass.  The other officer told the reporter, "You got
that credential you're wearing from us, and we can take it away from
you."[57]

n.  On March 17, 2012, NYPD officers threw down and beat cameraman ZD
Roberts with batons, even after he had shown his press pass.  The
photographer reportedly "yelled several times, 'I'm PRESS! PRESS!' but
was hit on his head [with a baton] twice after he'd been thrown to the
ground when the police shoved a group of protestors."[58]

o.  On August 4, 2012, the NYPD interfered with and arrested *New York
Times* photographer Robert Stolarik in the Bronx while he was taking
pictures of an arrest which was part of the "stop and frisk" program.
Stolarik was displaying his press credentials in his left hand while using

---

[56] Michael Powell, *The Rules on News Coverage Are Clear, but the Police Keep Pushing*, N.Y. Times (Jan. 2, 2012), *available at* http://www.nytimes.com/2012/01/03/nyregion/at-wall-street-protests-clash-of-reporting-and-policing.html.

[57] *Id.*

[58] Greg Palast, *Update: Cops Beat Our Cameraman ZD Roberts*, Gregpalast.com (Mar. 18, 2012), http://www.gregpalast.com/cops-beat-our-cameraman-zd-roberts/ (last updated Mar. 19, 2012).

his right hand to take photographs.  An officer directed him to move back and to stop taking photographs; Stolarik continued to shoot.  Stolarik was arrested and given a desk appearance ticket, and charged with obstructing governmental administration and resisting arrest.  His press card was confiscated.  After efforts by *The New York Times* and the National Press Photographers Association, his press credentials were restored, but with the expiration date changed to the date of his next criminal hearing.  In the criminal proceeding against Stolarik, it was determined that one of the arresting NYPD officers had filed a false report that Stolarik discharged a flash in his face.  This NYPD officer was convicted of a felony crime of offering a false instrument for filing and sentenced to three years conditional discharge and community service.[59]

p.   From September 15-17, 2012, NYPD officers arrested five visual journalists during the course of their reporting on Occupy protesters.  The NYPD arrested one professional photographer after the photographer attempted to take a picture of an officer giving a dispersal order on a sidewalk.  The NYPD forced another journalist to the ground and detained the journalist, while a lieutenant in the NYPD's Legal Bureau shoved another journalist and blocked them from taking a photo.[60]

q.   On September 17, 2012, NYPD Captain Mark Iocco and other NYPD officers detained Alex Gerskovich while he was photographing police

---

[59] Complaint, *Stolarik v. City of New York et al.*, No. 15-05858 (S.D.N.Y. July 27, 2015), ECF No. 1.

[60] Christopher Robbins, *NYPD's pattern of harassing, arresting journalists continues*, GOTHAMIST (Sept. 19, 2012, 1:28 PM), http://gothamist.com/2012/09/19/nypds_harassment_of_journalists_con.php.

activity during the Occupy protests.  The NYPD officers demanded that

Gerskovich produce a press pass, and when he did not, NYPD Captain

Iocco and other NYPD officers aggressively grabbed Gerskovich, shoved

him against a brick wall, and unlawfully arrested him.  Gerskovich was

charged with two counts of trespass, and one count of disorderly conduct.

He remained in police custody for 60 hours following the arrest.[61]

107.     Despite widespread media coverage documenting the NYPD's unconstitutional

conduct toward members of the press during the 2012 Occupy Wall Street protests, in

the years that followed, NYPD officers have continued to unconstitutionally target,

obstruct, and retaliate against members of the press and public attempting to lawfully

film police conduct in public.  For example:

a.     On January 16, 2013, NYPD officers arrested a credentialed Brooklyn

photographer after he filmed them stopping and questioning teenagers in

Flatbush, Brooklyn.  Officers seized the reporter's camera and threw it to

the ground, deleted the pictures from his camera, and handcuffed the

reporter and held him against a wall.[62]

b.     On March 16, 2013, a journalist for the Welcome 2 Melrose blog recorded

an interaction between an NYPD officer and a man who the officer

believed was violating the open container law.  The officer asked the

journalist to stop recording, and when he refused, he was arrested and

---

[61] Complaint, *Gerskovich v. Iocco, et al.*, No. 15-07280-RMB (S.D.N.Y. Sept. 15, 2015), ECF No. 1, *available at* https://storage.courtlistener.com/recap/gov.uscourts.nysd.447454.1.0.pdf.

[62] Sandy Eller, *Charedi Photographer Claims Handcuffed by NYPD After Videotaping Flatbush Police Stop*, Vos Iz Neias (Jan. 20, 2013), http://www.vosizneias.com/122118/2013/01/20/brooklyn-ny-charedi-photographer-claims-handcuffed-by-nypd-after-videotaping-flatbush-police-stop.

given two summonses, one for an open container and the other for attempting to create a dangerous situation.[63]

c.  On September 25, 2013, NYPD officers arrested New York City resident Debra Goodman for filming their interaction with a citizen requiring medical attention.  After she began filming, the officer demanded that she produce identification, and arrested her when she refused.  The New York County District Attorney's Office ultimately dismissed all the charges against her.[64]

d.  On March 12, 2014, New York City resident Jason Disisto attempted to film an NYPD officer reaching into a pedestrian's pocket.  NYPD officers arrested Disisto and destroyed the cell phone Disisto had used to film the occurrence.  On the strength of a police report written up by the arresting officer Jonathan Munoz, prosecutors charged Disisto with obstructing governmental administration, disorderly conduct, and resisting arrest.  Munoz falsely wrote in the report that Disisto had lunged toward him and swung his fist.  After three angles of clear surveillance video disproved Munoz's account, charges against Disisto were dropped.  Munoz was convicted of four felony counts and three misdemeanors stemming from the false arrest, and sentenced to community service.[65]

---

[63] Ben Yakas, *Video: Bronx Man Hauled To Jail For Exercising Right To Videotape Cops*, GOTHAMIST (Mar. 16, 2013, 12:20 p.m.), https://gothamist.com/news/video-bronx-man-hauled-to-jail-for-exercising-right-to-videotape-cops (last updated Mar. 16, 2013, 1:09 PM).

[64] *Goodman v. City of New York*, No. 14-5261-CM (S.D.N.Y.).

[65] Nathan Tempey, *Cop Convicted Of Felonies For False Arrest Gets Community Service*, GOTHAMIST (June 9, 2017, 3:50 p.m.), https://gothamist.com/news/cop-convicted-of-felonies-for-false-arrest-gets-community-service.

e.       On May 16, 2014, NYPD Lieutenant Eugene Whyte prevented *New York Times* photographer Robert Stolarik from accessing the scene of a police-involved shooting that was open to the public and to other reporters, and had no boundary tape or barriers.  Lieutenant Whyte told Stolarik, "It's not open to you" and "It's always you, it's always you."[66]  Stolarik was known to NYPD due to the prior incident in 2012 set forth above.

f.       On July 18, 2014, New York City resident Ruben An observed three NYPD officers questioning another man and began filming the interaction on his cellphone.  An officer advised Mr. An to step back and he complied.  The NYPD officer threatened Mr. An with a disorderly conduct summons and requested identification.  Mr. An did not produce identification and continued filming.  The officer then twisted Mr. An's arm, confiscated his cellphone, and arrested him for obstruction of governmental administration and disorderly conduct.  A jury determined Mr. An was not guilty on all counts.[67]

g.       On April 14, 2015, NYPD-credentialed visual journalist Patrick Landers was documenting a Black Lives Matter protest when he began to film NYPD officers arresting a protestor.  Landers displayed his press pass and complied with one NYPD officer's instruction to take a step back.  Later, a different NYPD officer began pushing Landers, telling him that he did not care that he was press.  Another NYPD officer hit Landers' head with

---

[66] *See* Motion for Summary Judgment, *Stolarik*, No. 15-05858-RMB (S.D.N.Y. Mar. 17, 2017), ECF No. 78.

[67] *An v. City of New York*, No. 16-05381 (S.D.N.Y.).

a bullhorn and told him to back up.  Landers' own video footage shows
him complying with the order to back up.  NYPD officers arrested
Landers, falsely claiming in the report that he disobeyed an order to
remain on the sidewalk.  The charges against Landers were found to be
baseless and were dropped.[68]

h.   On March 29, 2015, NYPD officers arrested New York City resident
Daniel Teitell after he began filming NYPD officers interrogating a man
in a public park at night.  The officers explicitly told him that they were
arresting him rather than giving a citation because he had decided to film
them.  No citation would have even been justified, as the park was open to
the public at the time.[69]

i.   On October 30, 2015, NYPD officers confiscated photojournalist J.B.
Nicholas' NYPD-issued press pass after Mr. Nicholas, while on
assignment for the *New York Daily News*, photographed emergency
personnel transporting a victim of a recent building collapse.  The officers
involved falsely claimed Mr. Nicholas jumped onto the ambulance and
interfered with the transport operation, but video of the incident clearly
showed that Mr. Nicholas simply raised his camera in the air and took a
photo from behind the line of emergency workers assisting the victim.[70]

---

[68] *Landers v. NYC Police Officer Keon Franks, et al.*, No. 16-05176 (E.D.N.Y. Sept. 16, 2016).

[69] *Teitell v. City of New York*, No. 15-4187 (E.D.N.Y.).

[70] *Nicholas v. Bratton*, 376 F. Supp. 3d 232, 250 (S.D.N.Y. 2019).

j.      On June 11, 2016, New York City resident Threstan Ralph observed five NYPD officers handcuffing a woman and recorded the interaction.  An officer arrested him and charged him with disorderly conduct for refusal to disperse, although the video shows he was clearly not interfering with the woman's arrest.[71]

k.      On June 21, 2016, New York City resident and activist Roy Beckford filmed an NYPD officer who was using a personal cell phone while on duty, which is a violation of NYPD policy.  The NYPD officer arrested Mr. Beckford on charges of disorderly conduct and using abusive language, and confiscated the phone Mr. Beckford had used to film the NYPD officer.  When Mr. Beckford's phone was returned by the NYPD, the video of the NYPD officer had been deleted.  On information and belief, NYPD personnel deleted the video.  The charges against Mr. Beckford were dropped before he appeared in court.[72]

108.    The NYPD and its officers' conduct during the George Floyd Protests in particular has drawn into sharp relief the NYPD's continuing and widespread unconstitutional pattern and practice of targeting, arresting and assaulting journalists for recording police activity in public places.  For example, in addition to the five separate incidents in which the Plaintiffs were arrested and/or beaten by the NYPD Officer Defendants for photographing police activity during the George Floyd Protests:

---

[71] John Marzulli, *EXCLUSIVE: NYPD accused of arresting man for recording video of cops cuffing woman*, NEW YORK DAILY NEWS (June 16, 2016), https://www.nydailynews.com/new-york/nypd-accused-arresting-man-recording-video-cops-article-1.2675620.

[72] *See Tempey, supra* note 65; *Beckford v. City of New York*, No. 17-00926 (S.D.N.Y. 2017).

48

a.   On May 31, 2020, Tyler Blint-Welsh, a reporter for *The Wall Street Journal*, was hit multiple times by NYPD officers while covering a protest.  Mr. Blint-Welsh wrote on Twitter that "I was backing away as requested, with my hands up" and that "My NYPD-issued press badge was clearly visible."[73]

b.   On June 2, 2020, New York City police officers surrounded, shoved and yelled expletives at two Associated Press reporters, video journalist Robert Bumsted and photographer May-E Wong, as the pair was filming and photographing police ordering protestors to leave the area near Fulton Street and Broadway shortly after the 8:00 p.m. curfew took effect. Portions of the incident captured by Bumsted on videotape show an officer using an expletive, and ordering the two journalists to go home, to which Bumsted is heard saying that the press are considered "essential workers" and are allowed to be on the streets.  An officer is heard responding that "I don't give a shit," while another office told Bumsted to "get the fuck out of here you piece of shit."  Bumsted and Wong said that, during this incident, NYPD officers shoved them, separating them from each other and pushing them toward Bumsted's car, with Bumsted at one point pinned against his car by police.  Both journalists were wearing AP identification and identified themselves as members of the media.  Having forcibly prohibited the two AP journalists from documenting police

---

[73] *Police Target Journalists as Trump Blames 'Lamestream Media' for Protests*, N.Y. TIMES (June 1, 2020), https://www.nytimes.com/2020/06/01/business/media/reporters-protests-george-floyd.html.

activity, the NYPD officers ultimately allowed the two reporters to leave in Bumsted's car.[74]

c.    On November 1, 2020, NYPD officers unlawfully assaulted and arrested Chae Kihn, an independent visual journalist who was covering an anti-Trump protest near Chelsea Piers in Manhattan.  Prior to her assault and arrest, Ms. Kihn was in an empty roadway, moving toward the sidewalk to comply with NYPD officers' instruction to stay on the sidewalk.  As Ms. Kihn reached the sidewalk, NYPD officers tackled Ms. Kihn to the ground and arrested her, even as bystanders shouted that she was a member of the media.  The NYPD charged Ms. Kihn with obstructing traffic, and the charge was subsequently dismissed in the interest of justice on January 22, 2021.  The NYPD arrested another visual journalist at the same protest, also as he was complying with orders to move to the sidewalk.  Bystander videos documented these events.[75]  On November 1, 2020, as press reports emerged about these unlawful arrests, the NYPD's official press twitter account posted a tweet claiming that reports that "members of the press were arrested" were "false" because the two journalists arrested did not have NYPD-issued press credentials.  A screenshot of this tweet is below.

---

[74] Associated Press, *Police Shove, Make AP Journalists Stop Covering Protest* (June 3, 2020), https://apnews.com/article/us-news-new-york-city-manhattan-ny-state-wire-journalists-1d2d9e4afdd822b27bfcce570e0cbdb5.

[75] Sydney Pereira & Gwynne Hogan, *Heavily Armored NYPD Officers Arrest 11 While Quashing Small Anti-Trump Protest In Manhattan*, GOTHAMIST (Nov. 1, 2020), https://gothamist.com/news/heavily-armored-nypd-officers-arrest-10-while-quashing-small-anti-trump-protest-manhattan.



  d. The clearly established First Amendment right to record police activity in

public does not require journalists to have an NYPD-issued press pass or

any press pass in order to record police activity in public.  The

fundamental misunderstanding of who qualifies as "press" displayed in

this Tweet evidences the NYPD's failure to train its officers – or even its

media spokespeople – on the First Amendment rights of journalists.  As

evidenced by this Tweet, the NYPD has had a widespread practice,

custom and de facto policy of requiring an NYPD-issued press pass for

journalists and others to record police activity in public.

109. On January 14, 2021, the New York Attorney General filed a lawsuit against the

City of New York on behalf of New York citizens, alleging claims against the City arising from

the mistreatment of peaceful protestors by NYPD officers.  As part of a narrow subset of its

claims, the Attorney General also alleges a pattern of repeated incidents in which NYPD officers interfered with the rights of citizens, journalists, and others to observe, record, and report on the George Floyd Protests.

110.    The NYPD officers involved in the incidents identified in Paragraphs 58 through 101 and 105 through 109 held positions of varying seniority with the NYPD.  Supervising and senior members of the NYPD were often on the scene, or were notified of the incidents, but took no corrective measures.

111.    Upon information and belief, there have been many other instances similar to those described in Paragraphs 58 through 101 and 105 through 109 in which NYPD officers have obstructed and/or prevented journalists and members of the public from recording police activity in public.

**The City, Mayor de Blasio, Police Commissioner Shea and other NYPD Supervisory Personnel have knowledge of the NYPD's Widespread Practice of Obstructing and Preventing Journalists and Members of the Public from Recording Police Activity, But Have Deliberately Failed to Correct this Unconstitutional Practice**

112.    At all times relevant to this Complaint, the NYPD has had a persistent, widespread policy, custom and practice of obstructing and/or preventing members of the media and others from filming police activity in public locations, in violation of the First Amendment. As illustrated by the examples above, NYPD officers have regularly acted pursuant to this widespread policy, custom and practice by, among other things: (a) arresting individuals without probable cause in retaliation for recording NYPD activity; (b) fabricating arrest reports to create the appearance of probable cause to arrest individuals recording police activity in public places; (c) effectuating illegal mass arrests that necessarily sweep up members of the media and individuals exercising their First Amendment right to record; (d) ordering members of the media to cease recording or leave public scenes, even while bystanders are allowed to remain; (e)

improperly refusing to honor valid press credentials; (f) requiring that journalists have NYPD-issued press credentials in order to record police activity; and (g) using force to physically prevent members of the media and individuals from recording police activity.

113.    This policy, custom and practice is widespread among NYPD officers, and has been frequently reported to senior officers of the NYPD and to DCPI by those who have been prevented from filming police activity in public and by the National Press Photographers Association.  The City, Mayor de Blasio, Police Commissioner Shea, and other NYPD supervisory personnel have at all relevant times had knowledge of this unconstitutional policy, custom and practice, and have knowingly disregarded, tolerated and failed to correct this unconstitutional policy, custom and practice despite having the ability to do so.

**The City and NYPD Have Failed to Adequately Train its Officers on the First Amendment Right to Record Police Activity in Public.**

114.    At all times relevant to this Complaint, the NYPD has had a policy, custom and practice of failing to train its officers on the clearly established First Amendment right of the press and public to record police activity in public locations.  Upon information and belief, at all times relevant to this Complaint, the NYPD failed to properly train its police recruits that individuals, including members of the media, have a First Amendment right to film or photograph police activity taking place in public.  Upon information and belief, at all times relevant to this Complaint, the NYPD also failed to provide refresher training to active-duty police officers on the First Amendment right of the press and public to film or photograph police activity in public places.

115.    None of the incidents identified in Paragraphs 58 through 101 and 105 through 109  has resulted in any substantial changes to any NYPD training material on interactions with members of the media and/or the right of individuals to record police activity in public.

Case 1:21-cv-06610-CM   Document 123   Filed 03/10/23   Page 54 of 85

116.    The NYPD's training material regarding the recording of police activity in public places has not been substantively updated since 2000, despite the massive increase in the general availability of cell phone cameras and other personal recording equipment since that time.

117.    At all times relevant to this Complaint, the NYPD also failed to train its police recruits and active-duty officers that, according to its own general orders in the NYPD Patrol Guide, members of the media may not be excluded from areas open to the general public, and that officers may not detain, arrest or retaliate against individuals for filming or photographing police activity in public.

118.    NYPD officers and NYPD supervisory personnel incorrectly believe that an NYPD-issued press pass is required for journalists to record police activity in public, and the NYPD has failed to train NYPD officers that a press pass is not required under the First Amendment for a journalist or member of the public to record police activity in public places.

119.    On information and belief, current training of NYPD officers continues to be insufficient to put an end to these ongoing constitutional violations, and it is reasonable to expect the aforementioned violations to recur.

120.    NYPD officers regularly encounter journalists, visual journalists, and individuals recording police activity in the course of their duties in public places.  As the long list of incidents recounted above makes clear, the City, Mayor de Blasio, Police Commissioner Shea, and other NYPD supervisory personnel know to a "moral certainty" (a) that NYPD officers have a history of mishandling these situations by improperly preventing journalists and the public from recording police conduct in public locations, and/or retaliating against journalists and the public for such recording and (b) that such wrong choices by NYPD officers almost inevitably lead to the violations of citizens' constitutional rights.  The fact that countless officers

nevertheless continue to violate these First Amendment rights, with either the tacit or express

support of supervisory personnel, reveals a failure to train that is endemic throughout the NYPD

and demonstrates a de facto policy and custom of deliberate indifference by the City, the NYPD,

Mayor de Blasio, Police Commissioner Shea, and other NYPD supervisory personnel to the First

Amendment rights of the public and press to record police conduct in public.

**The City and NYPD Have Failed to Supervise and Discipline Its Officers Who Violate the Constitutional Right to Record Police Activity in Public**

121.   At all times relevant to this Complaint, the City and NYPD have had a policy,

custom and practice of failing to supervise and discipline NYPD officers who unlawfully

obstruct or prevent members of the press and the public from recording police activity conducted

in public view, or who retaliate against the press and public for making such recordings, despite

their awareness that these violations of First Amendment rights happen regularly.

122.   Upon information and belief, few if any of the NYPD officers involved in the

incidents listed in Paragraphs 58 through 101 and 105 through 109 above have been disciplined

in any meaningful way by the City or NYPD for their unlawful conduct in obstructing and/or

preventing members of the media and public from filming police activity in public.

123.   Upon information and belief, in the over two years since the events outlined in

this Complaint, none of the individual NYPD Officer Defendants have been disciplined by the

NYPD.

124.   The NYPD's Internal Affairs Bureau ("IAB") also failed to take meaningful

action in response to the events outlined in this Complaint.  For example, an IAB investigation

into the incident involving Jae Donnelly returned findings that the Donnelly's claims were

"unsubstantiated," that the identity of his assailant could not be determined, and that—though the

IAB investigator reviewed a video clearly showing an NYPD Sargeant hit Donnelly and then

chase him with his baton drawn—it could not be "proven or disproven" whether any force had been used against Donnelly.  A parallel investigation by the Citizen Complaint Review Board, however, identified Sargeant Hewitson as Donnelly's assailant and returned a finding substantiating that Hewitson had used force against Donnelly.

125.    An IAB investigation into the incident involving Adam Gray similarly rubber-stamped the NYPD's misconduct by incorrectly determining Gray's allegations were "unfounded."  The investigators concluded that Gray's arrest for unlawful assembly was "appropriate and justified" because he "was instructed to leave the area several times" but "refused to comply."  Gray was never instructed to leave the area, nor is there any evidence showing that he was.   Moreover, the IAB investigator did not appear to consider or even mention in their report that Gray was a credentialed journalist engaged in photographing newsworthy events, meaning his actions by definition could not meet the elements of unlawful assembly.  The IAB further concluded that force had not been used against Gray because bodyworn camera footage from the scene "contradicts Mr. Gray's claim that he was pushed to the ground"—however, this same bodyworn camera footage shows that Gray *was on the ground*, with Officer Tirro standing over him, before Lieutenant Cattani lunged in to grab him and initiate his arrest.

126.    The IAB's investigations of these events demonstrates a pattern of disregarding and misconstruing evidence in order to clear the NYPD of charges of wrongdoing and thereby entrench unconstitutional police practices.

127.    Such repeated failure to supervise and discipline demonstrates a de facto policy and custom of deliberate indifference by the City, the NYPD, Mayor de Blasio, Police

Commissioner Shea, and other NYPD supervisory personnel to the First Amendment rights of

the public and press to record police conduct in public.

**The City's and NYPD's Unconstitutional Policies, Customs and Practices Caused the Injuries to Plaintiffs and the Violations of Their Constitutional Rights**

128.    The assaults and arrests without probable cause of the Plaintiffs by the NYPD

Officer Defendants, and the resulting violations of the Plaintiffs' First Amendment, Fourth

Amendment and Fourteenth Amendment rights, were a direct and proximate result of the

wrongful *de facto* policies and/or well-settled and widespread customs and practices of the

NYPD and of the knowing and repeated failure of the City, the NYPD, Mayor de Blasio, Police

Commissioner Shea, and other NYPD supervisory personnel to properly supervise, train and

discipline their police officers to keep them from improperly and unlawfully obstructing and/or

preventing journalists from recording police activity in public locations.

129.    The NYPD Officer Defendants involved in the incidents with the Plaintiffs were

plainly aware of these widespread policies, customs and practices of the NYPD, which led them

to assume that their unlawful behavior would be tolerated.

**CLAIMS FOR RELIEF**
**COUNT I**

***Monell* Claim under 42 U.S.C. § 1983 for Violation of the Plaintiffs' First, Fourth and Fourteenth Amendment Rights**
**(All Plaintiffs against the City of New York)**

130.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 146 as if

fully set forth herein.

131.    In arresting without probable cause and/or assaulting the Plaintiffs for recording

police activity in public, the NYPD Officer Defendants violated each Plaintiff's clearly

established rights under the First, Fourth, and Fourteenth Amendments to the United States

Constitution.

132.   At all times relevant to this Complaint, the NYPD Officer Defendants were acting under color of state law.

133.   At all times relevant to this Complaint, the NYPD has had a widespread policy, custom and practice of obstructing and/or preventing members of the media from recording police activity in public locations, and of targeting, arresting and/or assaulting journalists for recording police activity in public places, in violation of the First, Fourth and Fourteenth Amendments to the United States Constitution.

134.   At all times relevant to this Complaint, the City, Mayor de Blasio, Police Commissioner Shea, and other NYPD supervisory personnel have been on notice that the NYPD has a policy, custom and practice of obstructing and/or preventing members of the media from recording police activity, and of targeting, arresting, and assaulting journalists for recording police activity in public places, but have failed to rectify this unconstitutional policy, custom and practice, thereby demonstrating deliberate indifference to citizens' First Amendment, Fourth Amendment and Fourteenth Amendment rights.

135.   Despite this notice, the City, Mayor de Blasio, Police Commissioner Shea, and other NYPD supervisory personnel have failed to properly train NYPD officers about the First Amendment right of the public and press to record public scenes of police activity, thereby demonstrating deliberate indifference to citizens' constitutional rights.

136.   Despite this notice, the City, Mayor de Blasio, Police Commissioner Shea, and other NYPD supervisory personnel have failed to supervise and discipline NYPD officers for unlawfully interfering with the First Amendment right of the public and press to record public scenes of police activity, thereby demonstrating displaying deliberate indifference to citizens' constitutional rights.

137.    By their actions and inactions, the City, Mayor de Blasio, Police Commissioner Shea, and other NYPD supervisory personnel, all of whom are responsible for establishing policies, have implemented, enforced, encouraged, sanctioned and ratified policies, customs and practices that interfere with, and retaliate against, the exercise by journalists of their First Amendment right to record police activity in public places.  These actions and inactions caused the violations of Plaintiffs' First, Fourth and Fourteenth Amendment rights.

138.    These unconstitutional policies, customs and practices of the City, Mayor de Blasio, Police Commissioner Shea, and other NYPD supervisory personnel, acting through the NYPD, were the moving force behind the NYPD Officer Defendants' violations of the Plaintiffs' constitutional rights as alleged herein, rendering the City to each Plaintiff under 42 U.S.C. § 1983.

139.    As a direct and proximate result of the City's unconstitutional policies, customs and practices, the Plaintiffs suffered damages including impairment of their First, Fourth and Fourteenth Amendment rights, physical injuries, emotional distress, and professional injuries.

140.    Each Plaintiff intends to continue engaging in professional visual journalism documenting newsworthy police activity from public locations, but each Plaintiff fears further obstruction, harassment, detention, and/or violent retaliation by NYPD officers.  That fear prevents the Plaintiffs from doing their jobs as effectively as they should and makes it more difficult for them to gather news for dissemination to the public.

### COUNT II

**Claim for violation of New York State Constitution,
Article 1, § 8 (Free Press Provision)
(All Plaintiffs against All Defendants)**

141.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 146 as if fully set forth herein.

142.   In arresting without probable cause and/or assaulting the Plaintiffs for recording police activity in public, the NYPD Officer Defendants deprived each Plaintiff of the free speech and free press rights guaranteed to them as journalists under Article 1, Section 8 of the New York State Constitution.

143.   The violations by the NYPD Officer Defendants of each Plaintiff's rights under Article 1, Section 8 of the New York State Constitution were directly and proximately caused by policies, practices and customs devised, implemented, enforced, encouraged, and sanctioned by the City of New York, acting through Mayor de Blasio, Police Commissioner Shea, and other NYPD supervisory personnel.

144.   In violating each Plaintiff's rights under Article 1, Section 8 of the New York State Constitution, each NYPD Officer Defendant was acting within the scope of his or her employment by the City of New York.

145.   As a direct and proximate result of all Defendants' conduct, the Plaintiffs suffered damages including impairment of their rights under Article 1, Section 8 of the New York State Constitution, physical injuries, emotional distress, and professional injuries.

146.   Each Plaintiff intends to continue engaging in professional visual journalism documenting newsworthy police activity from public locations, but each Plaintiff fears further obstruction, harassment, detention, and/or violent retaliation by NYPD officers.  That fear prevents the Plaintiffs from doing their jobs as effectively as they should, and makes it more difficult for them to gather news for dissemination to the public.

**COUNT III**

**Claim under 42 U.S.C. § 1983 for Violation of
Adam Gray's First and Fourteenth Amendment Rights
(Against NYPD Officer Nicholas Terrett, NYPD Officer Luigi Tirro, NYPD Officer Adam
Muniz, NYPD Officer Leonel Giron, NYPD Lieutenant Daniel Gallagher, NYPD
Lieutenant Robert Cattani, and NYPD Deputy Inspector Stephen Spataro (collectively "the
Adam Gray Defendants"))**

147.    Mr. Gray repeats and realleges the allegations in Paragraphs 1 through 146 as if fully set forth herein.

148.    Observing and recording police activity in public is a legitimate means of gathering information for public dissemination that is protected by the free speech and free press clauses of the First Amendment to the United States Constitution, as applied to the State of New York under the Fourteenth Amendment.

149.    By assaulting, arresting and detaining Mr. Gray without probable cause and for the sole reason that he was recording police activity in public, the Adam Gray Defendants violated Mr. Gray's First Amendment rights.

150.    The conduct of the Adam Gray Defendants violated a clearly established First Amendment right, of which each of the Adam Gray Defendants knew, or of which reasonable police officers should have known, rendering them liable to Mr. Gray under 42 U.S.C. § 1983.

151.    The Adam Gray Defendants acted with reckless and callous indifference to Mr. Gray's First Amendment rights.

152.    As a direct and proximate result of the actions of the Adam Gray Defendants, Mr. Gray suffered damages including impairment of his First Amendment rights, emotional distress, and professional injury.

153.    At all times, the Adam Gray Defendants were acting within the scope of their employment by the City of New York and under color of state law.

## COUNT IV

### Claim under 42 U.S.C. § 1983 for Violation of
### Adam Gray's Fourth and Fourteenth Amendment Rights
### (Against the Adam Gray Defendants)

154.    Mr. Gray repeats and realleges the allegations in Paragraphs 1 through 153 as if fully set forth herein.

155.    Under the Fourth Amendment to the United States Constitution, as applied to the State of New York under the Fourteenth Amendment, Mr. Gray has a right to be free from arrest without probable cause, from unreasonable searches and seizures, and from excessive use of force.

156.    The Adam Gray Defendants violated Mr. Gray's Fourth Amendment rights when they arrested and detained Mr. Gray and seized his professional camera equipment and laptop without probable cause to believe that Mr. Gray was engaged in any criminal activity.

157.    Officer Tirro violated Mr. Gray's Fourth Amendment rights in using force that was excessive and objectively unreasonable in effectuating Mr. Gray's arrest and seizing his property.

158.    The conduct of the Adam Gray Defendants violated clearly established Fourth Amendment rights, of which the Adam Gray Defendants knew, or of which reasonable police officers should have known, rendering them liable to Mr. Gray under 42 U.S.C. § 1983.

159.    The Adam Gray Defendants acted with reckless and callous indifference to Mr. Gray's Fourth Amendment rights.

160.    As a direct and proximate result of the actions of the Adam Gray Defendants, Mr. Gray suffered damages including impairment of his Fourth Amendment rights, emotional distress, and professional injury.

161.    At all times, the Adam Gray Defendants were acting within the scope of their employment by the City of New York and were acting under color of state law.

## COUNT V

### Claim by Adam Gray for Violation of Privacy Protection Act of 1980, 42 U.S.C. § 2000aa
### (Against City of New York and the Adam Gray Defendants)

162.    Mr. Gray repeats and realleges the allegations in Paragraphs 1 through 161 as if fully set forth herein.

163.    At the time of the incident involving the Adam Gray Defendants and Mr. Gray, all of the Adam Gray Defendants  were government officers or employees acting in connection with the investigation or prosecution of a criminal offense.

164.    At the time of the incident involving the Adam Gray Defendants, Mr. Gray was a professional photographer who was taking photographs for the purpose of disseminating those photographs to the public in a newspaper in and affecting interstate and foreign commerce.

165.    At the time of the incident, the Adam Gray Defendants knew that Mr. Gray was a professional photographer who was taking photographs for the purpose of disseminating those photographs to the public.

166.    The seizure of Mr. Gray's professional camera equipment, laptop and photographs by the Adam Gray Defendants constituted a search and/or seizure of work product materials and documentary materials from Mr. Gray within the meaning of 42 U.S.C. § 2000aa.

167.    The Adam Gray Defendants seized Mr. Gray's professional camera equipment, laptop and photographs without probable cause to believe that Mr. Gray had committed a criminal offense to which those materials related.

168.    At all times, the Adam Gray Defendants were acting within the scope of their employment by the City of New York and were acting under color of state law

169.    The seizure of Mr. Gray's professional camera equipment, laptop and

photographs by the Adam Gray Defendants violated the Privacy Protection Act of 1980, 42

U.S.C. § 2000aa.

170.    By reason of this seizure of his professional camera equipment, laptop and

photographs, Mr. Gray suffered actual damages.

## COUNT VI

### Claim by Adam Gray for False Arrest
### (Against City of New York and the Adam Gray Defendants)

171.    Mr. Gray repeats and realleges the allegations in Paragraphs 1 through 170 as if

fully set forth herein.

172.    The Adam Gray Defendants  intended to confine Mr. Gray when they arrested

him and placed him in police custody.

173.    Mr. Gray was aware of his confinement by the Adam Gray Defendants.

174.    Mr. Gray did not consent to the confinement.

175.    The Adam Gray Defendants arrested Mr. Gray without probable cause, and their

actions were not otherwise privileged.

176.    The actions of the Adam Gray Defendants were flagrant, willful, wanton and

reckless, and displayed a high degree of moral culpability.

177.    As a direct and proximate result of the actions of the Adam Gray Defendants, Mr.

Gray suffered damages including emotional distress, and professional injury.

178.    At all times, the Adam Gray Defendants were acting within the scope of their

employment by the City of New York.

## COUNT VII

### Claim by Adam Gray for Assault
### (Against City of New York and NYPD Officer Luigi Tirro)

179.    Mr. Gray repeats and realleges the allegations in Paragraphs 1 through 178 as if fully set forth herein.

180.    Before unlawfully arresting Mr. Gray, Officer Tirro menaced Mr. Gray and intentionally placed him in reasonable apprehension of immediate physical harm by charging at Mr. Gray and shoving Mr. Gray to the ground with a baton.

181.    Officer Tirro knew that his actions would place Mr. Gray in apprehension of immediate physical harm and offensive contact.

182.    Officer Tirro  acted without justification or excuse for his actions.

183.    Officer Tirro's actions were flagrant, willful, wanton and reckless, and displayed a high degree of moral culpability.

184.    As a direct and proximate result of Officer Tirro's actions, Mr. Gray suffered damages including emotional distress and professional injury.

185.    At all times, Officer Tirro  was acting within the scope of his employment by the City of New York.

## COUNT VIII

### Claim by Adam Gray for Battery
### (Against City of New York and NYPD Officer Luigi Tirro)

186.    Mr. Gray repeats and realleges the allegations in Paragraphs 1 through 185 as if fully set forth herein.

187.    In the course of his unlawful arrest of Mr. Gray, Officer Tirro  intentionally shoved Mr. Gray with a baton, forcing Mr. Gray to the ground.

188.    Mr. Gray did not consent to the unlawful offensive contact by Officer  Tirro.

189.    Officer Tirro  acted without justification or excuse for his actions.

190.    Officer Tirro's actions were flagrant, willful, wanton and reckless, and displayed a high degree of moral culpability.

191.    As a direct and proximate result of Officer Tirro's actions, Mr. Gray suffered damages including emotional distress and professional injury.

192.    At all times, Officer Tirro was acting within the scope of his employment by the City of New York.

### COUNT IX

**Claim under 42 U.S.C. § 1983 for Violation of
Jemell D. Cole's First and Fourteenth Amendment Rights
(Against NYPD Captain Gzim Palaj and NYPD Officer Brianna Carlo)**

193.    Mr. Cole repeats and realleges the allegations in Paragraphs 1 through 192 as if fully set forth herein.

194.    Observing and recording police activity in public is a legitimate means of gathering information for public dissemination that is protected by the free speech and free press clauses of the First Amendment to the United States Constitution, as applied to the State of New York under the Fourteenth Amendment.

195.    By arresting and detaining Mr. Cole without probable cause and for the sole reason that he was recording police activity in public, NYPD Captain Palaj and NYPD Officer Carlo violated Mr. Cole's First Amendment rights.

196.    The conduct of Captain Palaj and Officer Carlo violated a clearly established First Amendment right, of which each of Captain Palaj and Officer Carlo knew, or of which reasonable police officers should have known, rendering them liable to Mr. Cole under 42 U.S.C. § 1983.

197.    Captain Palaj and Officer Carlo acted with reckless and callous indifference to Mr. Cole's First Amendment rights.

198.    As a direct and proximate result of the actions of Captain Palaj and Officer Carlo, Mr. Cole suffered damages including impairment of his First Amendment rights, emotional distress, and professional injury.

199.    At all times, Captain Palaj and Officer Carlo were acting within the scope of their employment by the City of New York and under color of state law.

### COUNT X

**Claim under 42 U.S. C. § 1983 for Violation of
Jemell D. Cole's Fourth and Fourteenth Amendment Rights
(Against NYPD Captain Gzim Palaj and NYPD Officer Brianna Carlo)**

200.    Mr. Cole repeats and realleges the allegations in Paragraphs 1 through 199 as if fully set forth herein.

201.    Under the Fourth Amendment to the United States Constitution, as applied to the State of New York under the Fourteenth Amendment, Mr. Cole has a right to be free from arrest without probable cause and from unreasonable searches and seizures.

202.    NYPD Supervising Officer Captain Palaj and NYPD Officer Carlo violated Mr. Cole's Fourth Amendment rights when they arrested and detained Mr. Cole and seized his professional camera equipment without probable cause to believe that Mr. Cole was engaged in any criminal activity.

203.    The conduct of Captain Palaj and Officer Carlo violated a clearly established Fourth Amendment right, of which Captain Palaj and Officer Carlo knew, or of which reasonable police officers should have known, rendering them liable to Mr. Cole under 42 U.S.C. § 1983.

204.    Captain Palaj and Officer Carlo acted with reckless and callous indifference to Mr. Cole's Fourth Amendment rights.

205.    As a direct and proximate result of the actions of Captain Palaj and Officer Carlo, Mr. Cole suffered damages including impairment of his Fourth Amendment rights, emotional distress and professional injury.

206.    At all times, Captain Palaj and Officer Carlo were acting within the scope of their employment by the City of New York and were acting under color of state law.

### COUNT XI

**Claim by Jemell D. Cole for Violation of New Yorker's Right to Monitor Act,
N.Y. Civil Rights Law § 79-P
(Against City of New York, NYPD Captain Gzim Palaj and NYPD Officer Brianna Carlo)**

207.    Mr. Cole repeats and realleges the allegations in Paragraphs 1 through 206 as if fully set forth herein.

208.    Prior to his arrest, Mr. Cole was exercising his rights under the N.Y. Civil Rights Law § 79-P, to record law enforcement activity and to maintain custody and control of the cameras he used to record law enforcement activities and the photographs he took.

209.    Prior to his arrest, Mr. Cole was not engaged in any actions that physically interfered with law enforcement activity or that otherwise constituted a crime involving obstruction of governmental administration.

210.    NYPD Captain Palaj and NYPD Officer Carlo unlawfully interfered with Mr. Cole's aforementioned rights under N.Y. Civil Rights Law § 79-P by arresting him, unlawfully seizing his camera equipment and photographs, and detaining him for hours because he had recorded law enforcement activity.

211.    Captain Palaj and Officer Carlo further interfered with Mr. Cole's aforementioned rights under N.Y. Civil Rights Law § 79-P because they intentionally prevented him from further recording law enforcement activity.

212.    Captain Palaj and Officer Carlo had no probable cause to arrest and detain Mr.

Cole or to seize his camera equipment and photographs.

213.    At all times, Captain Palaj and Officer Carlo were acting within the scope of their

employment by the City of New York.

214.    As a direct and proximate result of the actions of Captain Palaj and Officer Carlo,

Mr. Cole suffered damages including impairment of his right to monitor police activity,

emotional distress and professional injury.

## COUNT XII

**Claim by Jemell D. Cole for Violation of Privacy Protection Act of 1980, 42 U.S.C. § 2000aa
(Against City of New York, NYPD Captain Gzim Palaj and NYPD Officer Brianna Carlo)**

215.    Mr. Cole repeats and realleges the allegations in Paragraphs 1 through 214 as if

fully set forth herein.

216.    At the time of the incident involving Captain Palaj and Officer Carlo, they were

each a government officer or employee acting in connection with the investigation or prosecution

of a criminal offense.

217.    At the time of the incident involving Captain Palaj and Officer Carlo, Mr. Cole

was a professional photographer who was taking photographs for the purpose of disseminating

those photographs to the public in a form of public communication in and affecting interstate and

foreign commerce.

218.    At the time of the incident, Captain Palaj and Officer Carlo knew that Mr. Cole

was a professional photographer who was taking photographs for the purpose of disseminating

those photographs to the public.

219.     The seizure of Mr. Cole's professional camera equipment and photographs by Captain Palaj and Officer Carlo constituted a search and/or seizure of work product materials and documentary materials from Mr. Cole within the meaning of 42 U.S.C. § 2000aa.

220.     Captain Palaj and Officer Carlo seized Mr. Cole's camera equipment and photographs without probable cause to believe that Mr. Cole had committed a criminal offense to which those materials related.

221.     At all times, Captain Palaj and Officer Carlo were acting within the scope of their employment by the City of New York and were acting under color of state law.

222.     This seizure of Mr. Cole's professional camera equipment and photographs by Captain Palaj and Officer Carlo violated the Privacy Protection Act of 1980, 42 U.S.C. § 2000aa.

223.     By reason of this seizure of his professional camera equipment and photographs, Mr. Cole suffered actual damages.

### COUNT XIII

**Claim by Jemell D. Cole for False Arrest**
**(Against City of New York, NYPD Captain Gzim Palaj and NYPD Officer Brianna Carlo)**

224.     Mr. Cole repeats and realleges the allegations in Paragraphs 1 through 223 as if fully set forth herein.

225.     NYPD Captain Palaj and NYPD Officer Carlo intended to confine Mr. Cole when they arrested him and placed him in police custody.

226.     Mr. Cole was told by NYPD Sergeant Quigley that the NYPD knew that Mr. Cole had not been involved in any criminal act and should not have been arrested.

227.     Mr. Cole was aware of his confinement by Captain Palaj and Officer Carlo.

228.     Mr. Cole did not consent to the confinement.

229.    Captain Palaj and Officer Carlo arrested Mr. Cole without probable cause, and their actions were not otherwise privileged.

230.    The actions of Captain Palaj and Officer Carlo were flagrant, willful, wanton and reckless, and displayed a high degree of moral culpability.

231.    As a direct and proximate result of the actions of Captain Palaj and Officer Carlo, Mr. Cole suffered damages including emotional distress and professional injury.

232.    At all times, Captain Palaj and Officer Carlo were acting within the scope of their employment by the City of New York.

### COUNT XIV

**Claim under 42 U.S.C. § 1983 for Violation of
Jason Donnelly's First and Fourteenth Amendment Rights
(Against NYPD Sergeant Christopher Hewitson)**

233.    Mr. Donnelly repeats and realleges the allegations in Paragraphs 1 through 232 as if fully set forth herein.

234.    Observing and recording police activity in public is a legitimate means of gathering information for public dissemination that is protected by the free speech and free press clauses of the First Amendment to the United States Constitution, as applied to the State of New York under the Fourteenth Amendment.

235.    By pursuing and attacking Mr. Donnelly for the sole reason that he was recording police activity in public and thereby preventing Mr. Donnelly from recording police activity in public, NYPD Sergeant Hewitson violated Mr. Donnelly's First Amendment rights.

236.    The conduct of NYPD Sergeant Hewitson violated a clearly established First Amendment right, of which NYPD Sergeant Hewitson knew, or of which a reasonable police officer should have known, rendering him liable to Mr. Donnelly under 42 U.S.C. § 1983.

237.    NYPD Sergeant Hewitson acted with reckless and callous indifference to Mr. Donnelly's First Amendment rights.

238.    As a direct and proximate result of the actions of NYPD Sergeant Hewitson, Mr. Donnelly suffered damages including impairment of his First Amendment rights, physical injury, emotional distress, damage to his camera equipment, and professional injury.

239.    At all times, NYPD Sergeant Hewitson was acting in the scope of his employment by the City of New York and under color of state law.

**COUNT XV**

**Claim by Jason Donnelly for Assault**
**(Against City of New York and NYPD Sergeant Christopher Hewitson)**

240.    Mr. Donnelly repeats and realleges the allegations in Paragraphs 1 through 239 as if fully set forth herein.

241.    NYPD Sergeant Hewitson menaced Mr. Donnelly and intentionally placed him in reasonable apprehension of immediate physical harm while Mr. Donnelly was photographing police activity by rushing at Mr. Donnelly and striking him in the face, pursuing Mr. Donnelly with a drawn baton, and shoving Mr. Donnelly with excessive force that caused Mr. Donnelly to hit the ground several feet away.

242.    NYPD Sergeant Hewitson knew that his actions would place Mr. Donnelly in apprehension of immediate physical harm.

243.    NYPD Sergeant Hewitson acted without justification or excuse for his actions.

244.    NYPD Sergeant Hewitson' s actions were flagrant, willful, wanton and reckless, and displayed a high degree of moral culpability.

245.    As a direct and proximate result of NYPD Sergeant Hewitson' s actions, Mr. Donnelly suffered damages including physical injury, emotional distress, damage to his camera equipment, and professional injury.

246.    At all times, NYPD Sergeant Hewitson was acting in the scope of his employment by the City of New York.

## COUNT XVI

**Claim by Jason Donnelly for Battery**
**(Against City of New York and NYPD Sergeant Christopher Hewitson)**

247.    Mr. Donnelly repeats and realleges the allegations in Paragraphs 1 through 246 as if fully set forth herein.

248.    NYPD Sergeant Hewitson intentionally struck Mr. Donnelly in the face while Mr. Donnelly was photographing police activity and intentionally shoved Mr. Donnelly to the ground after chasing him.

249.    Mr. Donnelly did not consent to the unlawful offensive contact by NYPD Sergeant Hewitson.

250.    NYPD Sergeant Hewitson acted without justification or excuse for his actions.

251.    NYPD Sergeant Hewitson' s actions were flagrant, willful, wanton and reckless, and displayed a high degree of moral culpability.

252.    As a direct and proximate result of NYPD Sergeant Hewitson' s actions, Mr. Donnelly suffered damages including physical injury, emotional distress, damage to his camera equipment, and professional injury.

253.    At all times, NYPD Sergeant Hewitson was acting in the scope of his employment by the City of New York.

## COUNT XVII

### Claim under 42 U.S.C. § 1983 for Violation of
### Diana Zeyneb Alhindawi's First and Fourteenth Amendment Rights
### (Against NYPD Officer Christopher Radzinski)

254.    Ms. Alhindawi repeats and realleges the allegations in Paragraphs 1 through 253 as if fully set forth herein.

255.    Observing and recording police activity in public is a legitimate means of gathering information for public dissemination that is protected by the free speech and free press clauses of the First Amendment to the United States Constitution, as applied to the State of New York under the Fourteenth Amendment.

256.    Officer Radzinski, by charging at and attacking Ms. Alhindawi for the sole reason that she was recording police activity in public and thereby preventing Ms. Alhindawi from recording police activity in public,  violated Ms. Alhindawi's First Amendment rights.

257.    The conduct of Officer Radzinski  violated a clearly established First Amendment right of which Officer Radzinski knew, or of which a reasonable police officer should have known, rendering her liable to Ms. Alhindawi under 42 U.S.C. § 1983.

258.    Officer Radzinski  acted with reckless and callous indifference to Ms. Alhindawi's First Amendment rights.

259.    As a direct and proximate result of the actions of Officer  Radzinski, Ms. Alhindawi suffered damages including impairment of her First Amendment rights, physical injury, emotional distress, and professional injury.

260.    At all times, Officer Radzinski  was acting within the scope of his employment by the City of New York and under color of state law.

## COUNT XVIII

**Claim by Diana Zeyneb Alhindawi for Assault**
**(Against City of New York ,and NYPD Officer  Christopher Radzinski)**

261.    Ms. Alhindawi repeats and realleges the allegations in Paragraphs 1 through 260 as if fully set forth herein.

262.    Officer Radzinskimenaced Ms. Alhindawi and intentionally placed her in reasonable apprehension of immediate physical harm while Ms. Alhindawi was photographing police activity by charging at Ms. Alhindawi and striking her in the face with her baton and splitting her lip open.

263.    Officer Radzinski  knew that their actions would place Ms. Alhindawi in apprehension of immediate physical harm.

264.    Officer Radzinski  acted without justification or excuse for her actions.

265.    Officer Radzinski's actions   were flagrant, willful, wanton and reckless, and displayed a high degree of moral culpability.

266.    As a direct and proximate result of the actions of Officer Radzinski, Ms. Alhindawi suffered damages including physical injury, emotional distress, and professional injury.

267.    At all times, Officer Radzinski was acting within the scope of his employment by the City of New York.

## COUNT XIX

**Claim by Diana Zeyneb Alhindawi for Battery**
**(Against City of New York  and NYPD Officer Christopher Radzinski)**

268.    Ms. Alhindawi repeats and realleges the allegations in Paragraphs 1 through 267 as if fully set forth herein.

269.     Officer Radzinski  intentionally struck Ms. Alhindawi in the face with her baton, splitting Ms. Alhindawi's lip open, while Ms. Alhindawi was photographing police activity.

270.     Ms. Alhindawi did not consent to the unlawful offensive contact by Officer Radzinski.

271.     Officer Radzinski  acted without justification or excuse for their actions.

272.     Officer Radzinski's actions were flagrant, willful, wanton and reckless, and displayed a high degree of moral culpability.

273.     As a direct and proximate result of Officer Radzinski's actions, Ms. Alhindawi suffered damages including physical injury, emotional distress, and professional injury.

274.     At all times, Officer Radzinski was acting within the scope of his employment by the City of New York.

<u>**COUNT XX**</u>

**Claim under 42 U.S.C. § 1983 for Violation of
Amr Alfiky's First and Fourteenth Amendment Rights
(Against NYPD Officer Sean P. Robinson and NYPD Sergeant Daniel Slevin)**

275.     Mr. Alfiky repeats and realleges the allegations in Paragraphs 1 through 274 as if fully set forth herein.

276.     Observing and recording police activity in public is a legitimate means of gathering information for public dissemination that is protected by the free speech and free press clauses of the First Amendment to the United States Constitution, as applied to the State of New York under the Fourteenth Amendment.

277.     By arresting and detaining Mr. Alfiky on February 11, 2020 without probable cause and for the sole reason that Mr. Alfiky was recording police activity in public, NYPD Officer Robinson violated Mr. Alfiky's First Amendment rights.

278.    By seizing and refusing to return Mr. Alfiky's NYPD-issued press pass to Mr. Alfiky upon Mr. Alfiky's release from police custody as retaliation for Mr. Alfiky's filming of police activity, and as retaliation for Mr. Alfiky's assertion of his rights to film police activity, NYPD Sergeant Daniel Slevin violated Mr. Alfiky's First Amendment rights.

279.    The conduct of NYPD Officer Robinson and NYPD Sergeant Slevin violated clearly established First Amendment rights, of which NYPD Officer Robinson and NYPD Sergeant Slevin knew, or of which reasonable police officers should have known, rendering them liable to Mr. Alfiky under 42 U.S.C. § 1983.

280.    NYPD Officer Robinson and NYPD Sergeant Slevin acted with reckless and callous indifference to Mr. Alfiky's First Amendment rights.

281.    As a direct and proximate result of the actions of NYPD Officer Robinson and NYPD Sergeant Slevin, Mr. Alfiky suffered damages including impairment of his First Amendment rights and professional injury.

282.    At all times, NYPD Officer Robinson and NYPD Sergeant Slevin were acting within the scope of their employment by the City of New York and under color of state law.

## COUNT XXI

### Claim under 42 U.S.C. § 1983 for Violation of
### Amr Alfiky's Fourth And Fourteenth Amendment Rights
### (Against NYPD Officer Sean P. Robinson)

283.    Mr. Alfiky repeats and realleges the allegations in Paragraphs 1 through 282 as if fully set forth herein.

284.    Under the Fourth Amendment to the United States Constitution, as applied to the State of New York under the Fourteenth Amendment, Mr. Alfiky has a right to be free from arrest without probable cause, from unreasonable searches and seizures, and from excessive use of force.

285. On February 11, 2020, NYPD Officer Robinson violated Mr. Alfiky's Fourth Amendment rights when Officer Robinson arrested and detained Mr. Alfiky and seized his professional camera equipment without probable cause to believe that Mr. Alfiky was engaged in any criminal activity.

286. NYPD Officer Robinson also violated Mr. Alfiky's Fourth Amendment rights in using excessive and objectively unreasonable force in effectuating Mr. Alfiky's arrest and seizing his property.

287. The conduct of NYPD Officer Robinson violated clearly established Fourth Amendment rights, of which NYPD Officer Robinson knew, or of which a reasonable police officer should have known, rendering him liable to Mr. Alfiky under 42 U.S.C. § 1983.

288. NYPD Officer Robinson acted with reckless and callous indifference to Mr. Alfiky's Fourth Amendment rights.

289. As a direct and proximate result of the actions of NYPD Officer Robinson, Mr. Alfiky suffered damages including impairment of his Fourth Amendment rights and professional injury.

290. At all times, NYPD Officer Robinson was acting within the scope of his employment by the City of New York and acting under color of state law.

## COUNT XXII

### Claim by Amr Alfiky for False Arrest
### (Against City of New York and NYPD Officer Sean P. Robinson)

291. Mr. Alfiky repeats and realleges the allegations in Paragraphs 1 through 290 as if fully set forth herein.

292. On February 11, 2020, NYPD Officer Robinson intended to confine Mr. Alfiky when he arrested him and placed him in police custody without probable cause.

78

293.    Mr. Alfiky was aware of his confinement by NYPD Officer Robinson.

294.    Mr. Alfiky did not consent to the confinement.

295.    NYPD Officer Robinson arrested Mr. Alfiky without probable cause, and his actions were not otherwise privileged.

296.    The actions of NYPD Officer Robinson were flagrant, willful, wanton and reckless, and displayed a high degree of moral culpability.

297.    As a direct and proximate result of the actions of NYPD Officer Robinson, Mr. Alfiky suffered damages including professional injury.

298.    At all times, Defendant NYPD Officer Robinson was acting within the scope of his employment by the City of New York.

## COUNT XXIII

**Claim by Amr Alfiky for Assault**
**(Against City of New York and NYPD Officer Sean P. Robinson)**

299.    Mr. Alfiky repeats and realleges the allegations in Paragraphs 1 through 298 as if fully set forth herein.

300.    Before unlawfully arresting Mr. Alfiky on February 11, 2020, NYPD Officer Robinson menaced Mr. Alfiky and intentionally placed him in reasonable apprehension of immediate physical harm by charging at Mr. Alfiky, forcibly grabbing him, dragging him across the street, and shoving him against a car.  NYPD Officer Robinson knew that his actions would place Mr. Alfiky in apprehension of immediate physical harm.

301.    NYPD Officer Robinson acted without justification or excuse for his actions.

302.    NYPD Officer Robinson's actions were flagrant, willful, wanton and reckless, and displayed a high degree of moral culpability.

303.    As a direct and proximate result of NYPD Officer Robinson's actions, Mr. Alfiky suffered damages including professional injury.

304.    At all times, NYPD Officer Robinson was acting within the scope of his employment by the City of New York.

### COUNT XXIV

**Claim by Amr Alfiky for Battery**
**(Against City of New York and NYPD Officer Sean P. Robinson)**

305.    Mr. Alfiky repeats and realleges the allegations in Paragraphs 1 through 304 as if fully set forth herein.

306.    In the course of his unlawful arrest of Mr. Alfiky on February 11, 2020, NYPD Officer Robinson forcibly grabbed Mr. Alfiky, dragged him to the other side of the street, and shoved him against a car.

307.    Mr. Alfiky did not consent to the unlawful offensive contact by NYPD Officer Robinson.

308.    NYPD Officer Robinson acted without justification or excuse for his actions.

309.    NYPD Officer Robinson's actions were flagrant, willful, wanton and reckless, and displayed a high degree of moral culpability.

310.    As a direct and proximate result of NYPD Officer Robinson's actions, Mr. Alfiky suffered damages including professional injury.

311.    At all times, NYPD Officer Robinson was acting within the scope of his employment by the City of New York.

**COUNT XXV**

**Claim under 42 U.S.C. § 1983 for Violation of
Amr Alfiky's First and Fourteenth Amendment Rights
(Against NYPD Lieutenant Keith Hockaday)**

312.     Mr. Alfiky repeats and realleges the allegations in Paragraphs 1 through 311 as if fully set forth herein.

313.     Observing and recording police activity in public is a legitimate means of gathering information for public dissemination that is protected by the free speech and free press clauses of the First Amendment to the United States Constitution, as applied to the State of New York under the Fourteenth Amendment.

314.     By physically assaulting Mr. Alfiky on May 29, 2020 for the sole reason that he was recording police activity in public, NYPD Lieutenant Hockaday violated Mr. Alfiky's First Amendment rights.  NYPD Lieutenant Hockaday knowingly targeted Mr. Alfiky because he was a journalist, explicitly stating, "I don't give a fuck about your press pass!"

315.     The conduct of NYPD Lieutenant Hockaday violated clearly established First Amendment rights, of which NYPD Lieutenant Hockaday knew, or of which a reasonable police officer should have known, rendering him liable to Mr. Alfiky under 42 U.S.C. § 1983.

316.     NYPD Lieutenant Hockaday acted with reckless and callous indifference to Mr. Alfiky's First Amendment rights.

317.     As a direct and proximate result of the actions of NYPD Lieutenant Hockaday, Mr. Alfiky suffered damages including impairment of his First Amendment rights, physical injury, including a ruptured cyst requiring medical intervention, and professional injury.

318.     At all times, NYPD Lieutenant Hockaday was acting within the scope of his employment by the City of New York and under color of state law.

## COUNT XXVI

### Claim by Amr Alfiky for Assault
### (Against City of New York and NYPD Lieutenant Keith Hockaday)

319.    Mr. Alfiky repeats and realleges the allegations in Paragraphs 1 through 146 as if fully set forth herein.

320.    On May 29, 2020, NYPD Lieutenant Hockaday menaced Mr. Alfiky and intentionally placed him in reasonable apprehension of immediate physical harm by forcibly shoving Mr. Alfiky in the chest with his baton until he caused Mr. Alfiky to fall against a sidewalk with such force that it ruptured a cyst on his back.

321.    NYPD Sergeant Hockaday knew that his actions would place Mr. Alfiky in apprehension of immediate physical harm.

322.    NYPD Lieutenant Hockaday acted without justification or excuse for his actions.

323.    NYPD Lieutenant Hockaday's actions were flagrant, willful, wanton and reckless, and displayed a high degree of moral culpability.

324.    As a direct and proximate result of NYPD Lieutenant Hockaday's actions, Mr. Alfiky suffered damages including physical injury and professional injury.

325.    At all times, NYPD Lieutenant Hockaday was acting within the scope of his employment by the City of New York.

## COUNT XXVII

### Claim by Amr Alfiky for Battery
### (Against City of New York and NYPD Lieutenant Keith Hockaday)

326.    Mr. Alfiky repeats and realleges the allegations in Paragraphs 1 through 325 as if fully set forth herein.

82

327.    On May 29, 2020, NYPD Lieutenant Hockaday forcibly shoved Mr. Alfiky in the chest with his baton until he caused Mr. Alfiky to fall against a sidewalk with such force that Mr. Alfiky ruptured a cyst on his back.

328.    Mr. Alfiky did not consent to the unlawful offensive contact by NYPD Lieutenant Hockaday.

329.    NYPD Lieutenant Hockaday acted without justification or excuse for his actions.

330.    NYPD Lieutenant Hockaday's actions were flagrant, willful, wanton and reckless, and displayed a high degree of moral culpability.

331.    As a direct and proximate result of the actions of NYPD Lieutenant Hockaday, Mr. Alfiky suffered damages including physical injury and professional injury.

332.    At all times, NYPD Lieutenant Hockaday was acting within the scope of his employment by the City of New York.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court grant relief as follows:

a.    A declaratory judgment that the assaults carried out by the relevant NYPD Officer Defendants against Adam Gray, Diana Zeyneb Alhindawi, Jason Donnelly and Amr Alfiky for photographing police activity in public locations violated the constitutional rights of said Plaintiffs under the First and Fourteenth Amendments to the United States Constitution and under Article 1, Section 8 of the New York State Constitution;

b.    A declaratory judgment that the arrests by the relevant NYPD Officer Defendants of Adam Gray, Jemell D. Cole and Amr Alfiky for photographing police activity in public locations, and the seizure of said Plaintiffs' camera equipment, recording devices and photographs, violated the said Plaintiffs' rights under the

First, Fourth, and Fourteenth Amendments to the United States Constitution and under Article 1, Section 8 of the New York State Constitution;

c.    A declaratory judgment that the violations by the NYPD Officer Defendants of the First Amendment and Fourth Amendment rights of the Plaintiffs were committed pursuant to a widespread municipal policy, practice, and custom of the City of New York, acting through the NYPD, of obstructing, interfering with, and retaliating against, the recording of police activity in public places by journalists and members of the public;

d.    Injunctive relief (i) enjoining the City of New York, acting through the NYPD, from interfering with, targeting, arresting, or using physical force against, members of the press and public who are peacefully recording police activity in public places; and (ii) ordering the City of New York to develop and implement a comprehensive and effective policy of training, supervision, and discipline of NYPD officers to protect the First Amendment rights of the press and public to observe and record police activity in public places, including appropriate procedures to test the effectiveness of that policy;

e.    An award to each Plaintiff of compensatory damages against the City of New York and the NYPD Officer Defendants for damages suffered by each Plaintiff, in amounts to be determined at trial;

f.    An award to each Plaintiff of punitive damages against the NYPD Officer Defendants, in amounts to be determined at trial;

g.    An award of reasonable attorneys' fees and litigation costs under 42 U.S.C. § 1988 and N.Y. Civil Rights Law § 79-P(3)(d); and

     h.     Such other relief that this Court may deem just, proper, and appropriate.

Dated: New York, New York
       March 10, 2023

Respectfully submitted,
DAVIS WRIGHT TREMAINE LLP

By: */s/ Robert D. Balin*         

| | |
|---|---|
| Robert D. Balin | Mickey H. Osterreicher |
| Nimra H. Azmi | General Counsel |
| Abigail Everdell | NATIONAL PRESS PHOTOGRAPHERS |
| Kathleen Farley | ASSOCIATION |
| 1251 Avenue of the Americas, 21st Floor | 70 Niagara Street |
| New York, New York 10020 | Buffalo, New York 14202 |
| Phone: (212) 489-8230 | Tel: (716) 983-7800 |
| Fax: (212) 489-8340 | Fax: (716) 608-1509 |
| robbalin@dwt.comabigaileverdell@dwt.com | lawyer@nppa.org |
| kathleenfarley@dwt.com | |
| | Alicia Calzada (*pro hac vice*) |
| Wylie Stecklow | ALICIA WAGNER CALZADA, PLLC |
| WYLIE STECKLOW PLLC | Deputy General Counsel |
| Carnegie Hill Tower | National Press Photographers Association |
| 152 W. 57th Street, 8th Floor | 12023 Radium , Suite B1 |
| NY NY10019 | San Antonio, TX 78216 |
| (t) 212 566 8000 | 210-825-1449 |
| ecf@WylieLAW.com | Alicia@calzadalegal.com |

*Attorneys for Plaintiffs*